# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 301, 712, 2103 AND 3151 LLC; 12 TWENTY-SECOND AND 1827 LASALLE LLC; 137 EAST SEVENTEENTH STREET LLC; 1522 LASALLE AVENUE LLC; 1728 SECOND AVENUE AND 1801 THIRD AVENUE LLC; 1806 AND 1810 THIRD AVENUE LLC; 1816, 1820 AND 1830 STEVENS AVENUE LLC; 1817 SECOND AVENUE LLC; 1900 AND 1906 CLINTON AVENUE LLC; 1924 STEVENS AVENUE LLC; 2020 NICOLLET AVENUE LLC; 2101 THIRD AVENUE LLC; 2323 AND 2401 CLINTON AVENUE LLC; 2417, 2423 AND 2439 BLAISDELL AVENUE LLC; 2427 BLAISDELL AND 2432 FIRST AVENUE LLC; 25 TWENTY-FIFTH STREET LLC; 2535 CLINTON AVENUE LLC; 2545 BLAISDELL AVENUE LLC; 2609 HENNEPIN AVENUE LLC; 2633 PLEASANT AVENUE LLC; 2720 PILLSBURY AVENUE LLC; 2738 AND 2750 PILLSBURY AVENUE LLC; 2809 PLEASANT AVENUE LLC; 600 FRANKLIN AVENUE LLC; AMY SMITH; BLAISDELL 3322, LLC; BLOOMINGTON 4035, LLC; BRYANT AVENUE PROPERTIES LLC; COLFAX APARTMENTS LLC; DUPONT PROPERTIES LLC; FLETCHER PROPERTIES, INC.; FRANKLIN VILLA PARTNERSHIP, L.L.P.; FREMONT APARTMENTS, LLC; FREMONT TERRACE APARTMENTS, L.L.C.; GARFIELD COURT PARTNERSHIP, L.L.P.; GASPARRE NEW BOSTON SQUARE, LLC; GATEWAY REAL ESTATE, L.L.C.; JEC PROPERTIES, LLC; LAGOON APARTMENTS, LLC; LL LLC; | CIVIL ACTION NO. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

NORTHERN GOPHER ENTERPRISES,
INC.; PATRICIA L. FLETCHER, INC.; and
RAY PETERSON,

                Plaintiffs,

   v.

CITY OF MINNEAPOLIS,

                Defendant.

## **INTRODUCTION**

1.     This civil rights action addresses the unconstitutionality of an Ordinance Defendant City of Minneapolis (the "City") recently enacted that takes the fundamental right of owners, managers, and operators of apartment and other private multifamily housing (collectively, "Owner(s)") to decide who will be entitled to reside in their property.

2.     Minneapolis Ordinance 244.2030 (the "Ordinance"), governing "Applicant screening criteria for prospective tenants," dictates the criteria, including prior major felony convictions (such as for murder and arson), credit scores, and past rental history, predictive of the security risk tenant applicants present and the likelihood of applicants successfully meeting their rental obligations, that Owners may consider in assessing a rental application.

3.     An Owner may use prohibited screening criteria only if it conducts a time-consuming and expensive "individualized assessment" that requires Owners, under the threat of criminal prosecution and loss of use and occupancy licenses, to consider

whatever supplemental evidence applicants submit without specifying the standard to be employed in considering this evidence or the weight that is to be accorded.  If the Owner chooses to conduct an "individualized assessment," it must explain that evaluation in writing to each applicant should the Owner decline to rent to the applicant.

4.      While the Ordinance does not set forth a clear purpose or goal, it plainly does not fall within the City's police or land use regulatory powers.  Rather, the Ordinance acts to appropriate Owners' property to advance some unarticulated societal purpose.  In doing so, it violates fundamental and inalienable rights enshrined in the Fifth Amendment to the United States Constitution and Article I, Section 13 of the Minnesota Constitution prohibiting the taking of private property for public use without just compensation.  That would be true even if the societal interest sought to be advanced were appropriate.

5.      In fact, while Section (a) of the Ordinance is entitled "Findings and purpose," it offers nothing but a discombobulated series of disconnected, disjointed, and unsubstantiated findings offered in support of no discernible specific objective.

6.      As such, if the Ordinance fell within the City's police or land use regulatory authority, its enactment deprives Owners of substantive due process of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution by imposing restrictions upon fundamental property rights that do not substantially or even rationally advance some discernible, legitimate state interest.

7.      The Ordinance furthermore impermissibly compels Owners to speak in violation of the First Amendment of the United States Constitution and Article I, Section

3 of the Minnesota Constitution by forcing them to follow a specified script when considering applicants or, at their own expense, conduct significant investigation into an applicant's history.

8.      Finally, the Ordinance is overly vague and fails to inform Owners how to comply with its new requirements, in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

## **PARTIES**

9.      Plaintiff 301, 712, 2103 and 3151 LLC is a Minnesota limited liability company that owns one hundred and three (103) residential rental units located at 2103 Pleasant Avenue, 22 22nd Street East, and 301 22nd Street West in Minneapolis and is subject to the Ordinance.

10.     Plaintiff 12 Twenty-Second and 1827 LaSalle LLC is a Minnesota limited liability company that owns sixty-seven (67) residential rental units located at 12 22nd Street West and 1827 LaSalle Avenue in Minneapolis and is subject to the Ordinance.

11.     Plaintiff 137 East Seventeenth Street LLC is a Minnesota limited liability company that owns forty-six (46) residential rental units located at 2731 and 2741 Pillsbury Avenue South in Minneapolis and is subject to the Ordinance.

12.     Plaintiff 1522 LaSalle Avenue LLC is a Minnesota limited liability company that owns thirty (30) residential rental units located at 1522 LaSalle Avenue in Minneapolis and is subject to the Ordinance.

13.     Plaintiff 1728 Second Avenue and 1801 Third Avenue LLC is a Minnesota limited liability company that owns forty-nine (49) residential rental units located at 1703

and 1728 Second Avenue South and 1801 Third Avenue South in Minneapolis and is subject to the Ordinance.

14.     Plaintiff 1806 and 1810 Third Avenue LLC is a Minnesota limited liability company that owns sixty-eight (68) residential rental units located at 1714 Second Avenue South and 1806 and 1810 Third Avenue South in Minneapolis and is subject to the Ordinance.

15.     Plaintiff 1816, 1820 and 1830 Stevens Avenue LLC is a Minnesota limited liability company that owns one hundred and nine (109) residential rental units located at 1816, 1820 and 1830 Stevens Avenue in Minneapolis and is subject to the Ordinance.

16.     Plaintiff 1817 Second Avenue LLC is a Minnesota limited liability company that owns seventy (70) residential rental units located at 1817 Second Avenue South in Minneapolis and is subject to the Ordinance.

17.     Plaintiff 1900 and 1906 Clinton Avenue LLC is a Minnesota limited liability company that owns fifty-two (52) residential rental units located at 1900 and 1906 Clinton Avenue and 1915 and 1921 Third Avenue South in Minneapolis and is subject to the Ordinance.

18.     Plaintiff 1924 Stevens Avenue LLC is a Minnesota limited liability company that owns thirty-five (35) residential rental units located at 1924 Stevens Avenue and 1812 First Avenue South in Minneapolis and is subject to the Ordinance.

19.     Plaintiff 2020 Nicollet Avenue LLC is a Minnesota limited liability company that owns ninety-three (93) residential rental units and two (2) commercial units located at 2020 Nicollet Avenue South in Minneapolis and is subject to the Ordinance.

20.     Plaintiff 2101 Third Avenue LLC is a Minnesota limited liability company that owns fifty-two (52) residential rental units located at 2011 Second Avenue South and 2101 and 2115 Third Avenue South and 2424 and 2428 Fourth Avenue South in Minneapolis and is subject to the Ordinance.

21.     Plaintiff 2323 and 2401 Clinton Avenue LLC is a Minnesota limited liability company that owns thirty-nine (39) residential rental units located at 2323 and 2401 Clinton Avenue South in Minneapolis and is subject to the Ordinance.

22.     Plaintiff 2417, 2423 and 2439 Blaisdell Avenue LLC is a Minnesota limited liability company that owns twenty-six (26) residential rental units located at 2417, 2423 and 2439 Blaisdell Avenue in Minneapolis and is subject to the Ordinance.

23.     Plaintiff 2427 Blaisdell and 2432 First Avenue LLC is a Minnesota limited liability company that owns fifty-four (54) residential rental units located at 2427 and 2431 Blaisdell Avenue South and 2432 First Avenue South in Minneapolis and is subject to the Ordinance.

24.     Plaintiff 25 Twenty-Fifth Street LLC is a Minnesota limited liability company that owns twenty-four (24) residential rental units located at 25 25th Street East in Minneapolis and is subject to the Ordinance.

25.     Plaintiff 2535 Clinton Avenue LLC is a Minnesota limited liability company that owns seventy (70) residential rental units located at 2535 Clinton Avenue South and 2625 and 2632 Third Avenue South in Minneapolis and is subject to the Ordinance.

26.     Plaintiff 2545 Blaisdell Avenue LLC is a Minnesota limited liability company that owns sixty-one (61) residential rental units located at 2541, 2545, 2740 and 2804 Blaisdell Avenue in Minneapolis and is subject to the Ordinance.

27.     Plaintiff 2609 Hennepin Avenue LLC is a Minnesota limited liability company that owns twenty-six (26) residential rental units located at 2609 Hennepin Avenue and 2652 Bryant Avenue South in Minneapolis and is subject to the Ordinance.

28.     Plaintiff 2633 Pleasant Avenue LLC is a Minnesota limited liability company that owns forty-seven (47) residential rental units located at 2633 and 2740 Pleasant Avenue and 2800 Pillsbury Avenue in Minneapolis and is subject to the Ordinance.

29.     Plaintiff 2720 Pillsbury Avenue LLC is a Minnesota limited liability company that owns sixteen (16) residential rental units located at 2720 Pillsbury Avenue in Minneapolis and is subject to the Ordinance.

30.     Plaintiff 2738 and 2750 Pillsbury Avenue LLC is a Minnesota limited liability company that owns thirty-six (36) residential rental units located at 2738 and 2750 Pillsbury Avenue in Minneapolis and is subject to the Ordinance.

31.     Plaintiff 2809 Pleasant Avenue LLC is a Minnesota limited liability company that owns twenty-one (21) residential rental units located at 2809 Pleasant Avenue in Minneapolis and is subject to the Ordinance.

32.     Plaintiff 600 Franklin Avenue LLC is a Minnesota limited liability company that owns twenty-nine (29) residential rental units located at 600 Franklin Avenue West in Minneapolis and is subject to the Ordinance.

33.     Plaintiff Amy Smith is a resident of Minnesota and owns and operates eight (8) residential rental units located at 2408 Plymouth Avenue North, 1107 24th Street West, 3318 Dupont Avenue North, and 5924 Oliver Avenue South, all in Minneapolis. Smith owns these units in her personal capacity, personally manages several of the units, and is subject to the Ordinance.

34.     Plaintiff Blaisdell 3322, LLC is a Minnesota limited liability company that owns fourteen (14) residential rental units located at 3322 Blaisdell Avenue in Minneapolis and is subject to the Ordinance.

35.     Plaintiff Bloomington 4035, LLC is a Minnesota limited liability company that owns thirty-four (34) residential rental units located at 4035 Bloomington Avenue in Minneapolis and is subject to the Ordinance.

36.     Plaintiff Bryant Avenue Properties LLC is a Minnesota limited liability company that owns ninety-nine (99) residential rental units located at 2300, 2550 and 3532 Bryant Avenue South in Minneapolis and is subject to the Ordinance.

37.     Plaintiff Colfax Apartments LLC is a Minnesota limited liability company that owns ninety-four (94) residential rental units located at 3401 and 3435 Colfax Avenue South in Minneapolis and is subject to the Ordinance.

38.     Plaintiff Dupont Properties LLC is a Minnesota limited liability company that owns eighty-two (82) residential rental units located at 3040 and 3513 Dupont Avenue South in Minneapolis and is subject to the Ordinance.

39.     Plaintiff Fletcher Properties, Inc. is a Minnesota corporation that owns fifteen (15) residential rental units located at 1316 25-1/2 Street West and 2524 Hennepin Avenue in Minneapolis and is subject to the Ordinance.

40.     Plaintiff Franklin Villa Partnership, L.L.P. is a Minnesota limited liability partnership that owns seventy-two (72) residential rental units located at 305-315 Franklin Avenue West in Minneapolis and is subject to the Ordinance.

41.     Plaintiff Fremont Apartments, LLC is a Minnesota limited liability company that owns sixty four (64) residential rental units located at 3200 and 3300-3310 Fremont Avenue South and 3121 Hennepin Avenue in Minneapolis and is subject to the Ordinance.

42.     Plaintiff Fremont Terrace Apartments, L.L.C. is a Minnesota limited liability company that owns seventy-one (71) residential rental units located at 2825 and 2809 Fremont Avenue South in Minneapolis and is subject to the Ordinance.

43.     Plaintiff Garfield Court Partnership, L.L.P. is a Minnesota limited liability partnership that owns one hundred and ten (110) residential rental units located at 2101-2103 Garfield Avenue and 2312 First Avenue South and 2800 Grand Avenue South in Minneapolis and is subject to the Ordinance.

44.     Plaintiff Gasparre New Boston Square, LLC is a Minnesota limited liability company that owns ninety-eight (98) residential rental units located at 2015 Central Avenue Northeast in Minneapolis and is subject to the Ordinance.

45.     Plaintiff Gateway Real Estate, L.L.C. is a Minnesota limited liability company that owns fifty-three (53) residential rental units located at 4610 Lake Street East in Minneapolis and is subject to the Ordinance.

46.     Plaintiff JEC Properties, LLC is a Minnesota limited liability company that owns forty-four (44) residential rental units located at 1811 and 1841 Ulysses Street Northeast and 1822 and 1830 Hayes Street Northeast in Minneapolis and is subject to the Ordinance.

47.     Plaintiff Lagoon Apartments, LLC is a Minnesota limited liability company that owns sixty-one (61) residential rental units located at 1456 and 1511 Lagoon Avenue and 3210 Girard Avenue South in Minneapolis and is subject to the Ordinance.

48.     Plaintiff LL LLC is a Minnesota limited liability company that owns twelve (12) residential rental units located at 1605 Hennepin Avenue in Minneapolis and is subject to the Ordinance.

49.     Plaintiff Northern Gopher Enterprises, Inc. is a Minnesota corporation that owns seventy (70) residential rental units located at 940 Franklin Terrace and 2121 Garfield Avenue in Minneapolis and is subject to the Ordinance.

50.     Plaintiff Patricia L. Fletcher, Inc. is a Minnesota corporation that owns twelve (12) residential rental units located at 2736 Hennepin Avenue in Minneapolis and is subject to the Ordinance.

51.     Plaintiff Ray Peterson is a resident of Minnesota and co-owns and operates four (4) residential rental units located at 2111 13th Avenue South in Minneapolis.

Peterson co-owns these units in his personal capacity, personally manages the units, and is subject to the Ordinance.

52.     All of the above-referenced Plaintiffs are Owners in Minneapolis.

53.     Defendant City of Minneapolis is a Minnesota municipal corporation located in Hennepin County, Minnesota, subject to suit pursuant to Minnesota Statute § 412.211.  The City is a charter city, established pursuant to Chapter 410 of the Minnesota Statutes and Article XII, Section 4 of the Minnesota Constitution.  Its laws, including the Ordinance, are enacted by its City Council.  At all times relevant to this Complaint, the City was acting under the color of state law.

## JURISDICTION

54.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under 42 U.S.C. §§ 1983 and 1988 and the First, Fifth, and Fourteenth Amendments of the United States Constitution.

55.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' other claims because the same case and controversy give rise to violations of the Minnesota Constitution.

56.     This Court is empowered by 28 U.S.C. §§ 2201 and 2202 to grant declaratory as well as other forms of relief, including permanent injunctive relief, necessary to remedy the alleged constitutional violations.

## VENUE

57.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims arose in this judicial district and Defendant is a municipal corporation located in this judicial district.

## FACTS COMMON TO ALL COUNTS

### A.     Prospective Tenant Assessment

58.     Each of the Plaintiffs own, manage, and/or operate real property located in the City of Minneapolis in which they lease residential apartments.

59.     Leasing property is a consequential act fraught with serious risks.  It involves the demise of a real property interest and grants the tenant the exclusive right to possess the property (subject to certain inspection and other rights) during the term of the tenancy.

60.     While in exclusive possession of property, a tenant may significantly damage the premises.  The costs of remediating this damage often far exceeds the amount of any security deposits.

61.     Applicants may be antisocial, unstable, dishonest, or disruptive tenants and pose a danger to other tenants' and management or janitorial personnel's personal safety and quiet enjoyment of their premises.

62.     Owners naturally seek to exclude these types of tenants.

63.     Owners also have a duty to address and prevent instances of disruptive criminal and nuisance conduct in their rental communities.  Other City ordinances make it the responsibility of the *Owners* to take action, with the assistance of City personnel, to

12

prevent the commission of certain crimes and conduct on the premises, such as prostitution, drug activity, possession of weapons, and disorderly conduct.  An increase in criminal activity on the premises will lead to an increase in licensing oversight, City intervention, or even revocation of rental licenses.

64.     An Owner may be subject to civil liability from other tenants and/or employees that are harmed by tenants with a known criminal history.

65.     Tenants' conduct may be so extreme that police are summoned to the property.  Repeated dispatches of the police to an apartment is grounds to cancel an Owner's rental licenses.

66.     Tenants may stop paying rent because their income is insufficient to cover the lease payments, financial conditions worsen, they incur excessive unrelated debt obligations, or simply decide to disavow their obligations.

67.     High rates of default can be economically devastating to Owners.  When a tenant stops paying rent, an Owner may not be able to pay its mortgage or its real estate taxes, and there is no mechanism to suspend those obligations while awaiting rental payments.

68.     Evicting a tenant is a time consuming, costly, difficult, and extended process given the nature of leases and rights afforded residential tenants.  An eviction of one tenant can cost an Owner several thousand dollars in costs and fees, not including the time and attention necessary to see the process through.

69.     While Owners pursue eviction, tenants frequently remain a threat to the safety of other tenants and management and maintenance personnel and continue

13

disruptive conduct.  Repeated dispatches of the police may result in the revocation of an Owner's rental license even though it is attempting to evict a troublesome tenant.

70.     Further property damage often occurs and unpaid rents continue to mount during the eviction process.

71.     Owners rarely recover unpaid rents or reimbursement for property damage. Tenants are frequently judgment proof and it is otherwise impractical to recover against them.

72.     To address these risks, in the exercise of fundamental rights recognized since before the founding of the Nation, Owners historically used screening policies and procedures to limit the risk of renting their properties to individuals who would not uphold a safe, comfortable, and crime-free living environment.

73.     In the normal course of tenant screening, Owners, particularly those owning and/or managing multiple properties, developed matrixes of predictive factors that are objectively applied to qualify applicants.

74.     One of the criteria universally considered was prior criminal convictions because prior criminal conduct can be predictive of antisocial or disruptive conduct or the lack of stability necessary to meet ongoing lease obligations.  Indeed, Owners typically include an addendum to their leases, setting forth their expectation that tenants and/or their guests shall not engage in any criminal activity on the property.

75.     Owners also typically obtained criminal backgrounds checks of applicants and rejected those with criminal records inconsistent with their screening criteria.  These rejections were made to promote the safety of other tenants and management and

14

maintenance personnel, avoid property damage, provide a peaceful environment and limit the potential for tenant defaults.

76.    An applicant's credit history was also part of Owners' screening criteria. Owners typically obtained credit reports from third-party agencies that included a credit score calculated through analytics validated to be predictive of consumers' likelihood of defaulting on their obligations.  Owners relied upon these credit scores, as well as the other results of the credit report, in their overall evaluation of applicants.

77.    Applicants' prior rental history was also a screening criteria.  That history is predicative of a tenant's likelihood of meeting their lease obligations, damaging the apartment or posing a threat to other tenants, management or maintenance employees or tenants' quiet enjoyment of their residences.

78.    Owners also sought to assure that applicants earned sufficient income after other expenses and obligations to provide funds adequate to meet their rental obligation.

79.    Many Minneapolis Owners with a significant number of rental properties have used a minimum income test requiring income equal to three (3) times the rent or higher ("3x Income Test").  If an applicant does not meet the 3x Income Test, the Owner might reject the application.

80.    Owners' screening matrixes and other evaluations balanced these factors. In some instances, Owners accepted a tenant just meeting or failing the criteria on the condition that an additional security deposit be provided to offset the marginally higher risk the Owner was accepting.

B.     **The Minneapolis Ordinance**

81.     In September 2019, the Minneapolis City Council sought to end Owners' long-held right to control access to their property free from government interference through the enactment of the Ordinance.  (A true and correct copy of the Ordinance is attached as Exhibit "A").

82.     With no expressed purpose other than the vague assertion of the authority to provide "for the public health, safety and general welfare" and offering nothing other than a discombobulated series of disconnected, disjointed, and unsubstantiated findings, the Ordinance controls and imposes substantial limitations on the criteria Owners may consider in screening applicants.

83.     The Ordinance mandates that Owners screen applicants by: (1) applying "inclusive screening criteria" or (2) conducting an "individualized assessment."

84.     Before accepting applications for rental housing, an Owner "must make readily available to all applicants the landlord's rental screening criteria in as much detail as is feasible."

85.     If an Owner to applies the "inclusive screening criteria," it may not reject an applicant for certain reasons, including the applicant's criminal history, credit score, or rental history.

86.     With respect to criminal history, the Ordinance provides that an Owner may *not* reject an applicant for the following:

 a.     Any arrest in an inactive case that did not result in conviction;

b.  Participation in or completion of a diversion or a deferral of judgment program, including stays of adjudication and continuances for dismissal with or without prosecution;

c.  Any conviction that has been vacated or expunged, or for which the applicant received a stay of imposition of sentencing and complied with the terms of the stay;

d.  Any conviction for a crime that is no longer illegal in the state of Minnesota;

e.  Any conviction or any other determination or adjudication in the juvenile justice system;

f.  Any conviction for misdemeanor offenses for which the dates of sentencing are older than three (3) years;

g.  Any criminal conviction for felony offenses for which the dates of sentencing are older than seven (7) years; however, a landlord may deny an applicant who has been convicted of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802) or for those same offenses that mandate denial of tenancy in federally assisted housing subject to federal regulations, including but not limited to when any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program; or

h.  Any criminal conviction for the following felony offenses for which the dates of sentencing are older than ten (10) years: first-degree assault (Minnesota Statutes Section 609.221), first-degree arson (Minnesota Statutes Section 609.561), aggravated robbery (Minnesota Statutes Section 609.245), first-degree murder (Minnesota Statutes Section 609.185), second-degree murder (Minnesota Statutes Section 609.19), third-degree murder (Minnesota Statutes Section 609.195), first-degree manslaughter (Minnesota Statutes Section 609.20, subd. 1, 2, and 5), kidnaping (Minnesota Statutes Section 609.25, subd. 2(2)), or first-degree criminal sexual conduct (Minnesota Statutes Section 609.342, subd. 1(b) and (g)).

87.  If an Owner rejects an application on the basis of the applicant's criminal history, even under the limited circumstances permitted by the Ordinance's inclusive

screening criteria, the Owner must also consider any supplemental evidence provided by the applicant at the time of application.

88.     With respect to credit history, the Ordinance provides that an Owner may *not* reject an applicant (1) based on credit score by itself, although it may rely upon information within a credit report that is directly relevant to fitness of a tenant, or (2) insufficient credit history, unless the applicant in bad faith withholds credit history information that might otherwise form a basis for denial.

89.     Finally, with respect to rental history, the Ordinance provides that an Owner may *not* reject an applicant on the following bases:

a.     An eviction action pursuant to Minnesota Statutes Chapter 504B if the action:

1.     Was dismissed or resulted in a judgment for the applicant before the applicant submits the application;

2.     Was settled with no judgment or writ of recovery issued that was entered one (1) or more years before the applicant submits the application;

3.     Resulted in a judgment against the applicant that was entered three (3) or more years before the applicant submits the application; or

b.     Insufficient rental history, unless the applicant in bad faith withholds rental history information that might otherwise form a basis for denial.

c.     If a landlord uses a minimum income test requiring an income equal to three (3) times the rent or higher, the landlord must allow an exception to that test where the applicant can demonstrate a history of successful rent payment with an income less than three (3) times the rent.

90.     If an Owner denies an applicant based on the inclusive screening criteria, the Owner must notify the applicant within fourteen (14) days of the rejection and the specific criteria the applicant failed to meet.  Before denying an applicant for criminal history, a landlord must also consider supplemental evidence provided by the applicant at the time of the application.

91.     As noted above, should an Owner choose to use any of the prohibited screening criteria, it must conduct an "individualized assessment for any basis upon which the landlord intends to deny an application."  The Owner must accept and consider all supplemental information provided with the application to explain, justify or negate the relevance of potentially negative information.

92.     The Ordinance provides that the Owner must consider:

(1)     The nature and severity of the incidents that would lead to a denial;

(2)     The number and type of the incidents;

(3)     The time that has elapsed since the date the incidents occurred; and

(4)     The age of the individual at the time the incidents occurred.

93.     An Owner who denies an applicant after performing an individualized assessment must notify each such applicant in writing within fourteen (14) days of the rejection, providing the basis for denial and an explanation of the reasons why the supplemental evidence, if provided, did not adequately compensate for the factors which caused the Owner's rejection.

94.     Where an Owner fails to comply with these requirements, the Owner is subject to criminal prosecution, revocation of rental licenses, administrative fines,

19

restrictions, or penalties, and any other remedy available at equity or law.  These severe consequences may occur without any notice of violation to the Owner.

95.    The Ordinance became effective June 1, 2020, except for property owners with fifteen (15) dwelling units or less, for which the effective date is December 1, 2020.

96.    Coupled with enactment of the Ordinance was the City's passage of an ordinance governing security deposits, Minneapolis Ordinance 244.2040, which prohibits an Owner from obtaining from a tenant more than a single month rent as a security deposit (the "Security Deposit Ordinance").  Failure to comply with the Security Deposit Ordinance similarly subjects an Owner to criminal prosecution, revocation of rental licenses, and administrative fines, restrictions, or other penalties.

### C.    <u>The Ordinance's Unconstitutional Impact</u>

97.    The Ordinance requires owners to publish and implement their screening criteria and dictates the application of virtually every one of those criteria.

98.    The inclusive screening criteria dictates under what circumstances an individual's criminal past may disqualify an applicant, prohibits the disqualifying applicants based solely on credit score or lack of credit history, and specifies when adverse leasing experience may be considered.

99.    The Ordinance replaces Owners' judgment and industry-accepted practices pertaining to the suitability of tenants with a dictated legislative judgment by those inexperienced in the industry.

100.    It does so with broad, inflexible mandates that fail to account for the myriad circumstances that are routinely presented.

101.    The legislative judgment will patently force Owners to lease to tenants presenting a higher risk to other tenants, of damaging the premises and of default.

102.    In providing that conviction of crimes may not be considered within a specified time after the dates of sentencing, the Ordinance prohibits consideration of the number of convictions.  As recognized in the individualized assessment portion of the Ordinance, the number of convictions is highly predictive of the commission of additional crimes or other antisocial behavior and of a lack of the stability necessary to comply with a tenant's lease obligations.

103.    Similarly, juvenile dispositions may never be considered no matter how serious the underlying offenses, the number of dispositions, or how recently those offenses were committed.

104.    In prohibiting the consideration of convictions of serious felonies, such as first-degree murder, second-degree murder, third-degree murder, first-degree manslaughter, first-degree criminal sexual assault, kidnapping, first-degree arson, or first-degree assault more than ten (10) years after the "dates of sentencing," as a practical matter, the Ordinance prohibits Owners from considering that an applicant was only recently released from prison for one of these specified crimes.

105.    Assuming "dates of sentencing" (which is not clear) is the date a sentence was imposed by a judge, the date the Owner must consider is the date of that sentencing, not the date of release from incarceration for that sentence.  Thus, if an applicant is convicted of murder in 2010, sentenced in 2010, serves a 10-year sentence, and is released in 2020, the Owner cannot reject that applicant in 2020 based upon the 2010

21

murder conviction, even though the applicant has not even begun to demonstrate an intention or ability to become a law-abiding citizen.

106.    The Ordinance also mandates that an Owner cannot reject an applicant for any other felony conviction (other than manufacture/distribution of certain controlled substances or for someone subject to a lifetime sex offender registration) for which the "dates of sentencing" is older than seven (7) years.  If "dates of sentencing" means date of imposition of sentence by a judge, an Owner must rent to an applicant who has committed burglary, second-degree manslaughter, second-degree assault, second-degree arson, or vehicular homicide, including multiple offenses for any combination of those crimes over any period of time, so long as the last sentencing for one of those crimes occurred seven (7) years prior to the application.

107.    Under this mandate, if an applicant is convicted of second-degree manslaughter in 2013, sentenced in 2013, serves a seven (7) year sentence, and is released in 2020, the Owner cannot now reject that applicant based upon the 2013 manslaughter conviction, even though the applicant has only recently been released from prison and has not even begun to demonstrate an intention to become a law-abiding citizen, and even if the applicant has a string of convictions for similarly serious offenses prior to 2013.

108.    The Ordinance mandates that an Owner cannot reject an applicant for *any* misdemeanor conviction for which the "dates of sentencing" is older than three (3) years. If "dates of sentencing" means date of imposition of sentence by a judge, an Owner must rent to an applicant who committed, for example, fifth-degree assault, engaging in or

solicitation of prostitution, trespassing, domestic assault, theft, disorderly conduct, possession of dangerous weapons, or public nuisance, including multiple convictions for any combination of those criminal offenses, so long as the sentencing for the last of those crimes occurred three (3) years ago.

109.    Again, under this mandate, if an applicant has been convicted of and sentenced for engaging in domestic assault or recklessly using a gun or explosives as a tenant in a way that endangered the safety of others or is convicted of disorderly conduct for throwing noisy parties multiple times over an extended period ending in 2017, the Owner cannot reject that applicant based upon those convictions.

110.    Read together, these mandates of the Ordinance require Owners to rent to individuals who have been convicted of, sentenced, and incarcerated for serious crimes that are particularly concerning for Owners creating safe living environments for their tenants.  The consequences of renting to someone with a violent past can be catastrophic.

111.    The Ordinance fails to take into account that one individual could be convicted of multiple crimes, rendering him or her even more dangerous to the rental community.  For example, if an individual was convicted of murder, criminal sexual assault, *and* armed robbery and sentenced for those crimes over ten (10) years ago, the Ordinance requires the Owner to rent to that individual, regardless of the inherent danger in doing so.

112.    The same is true for less serious crimes.  An Owner may consider an applicant who has one three-year old misdemeanor conviction for fifth-degree assault to rent an apartment, but where that applicant has numerous misdemeanor convictions for

running a house of prostitution, the concern is elevated.  The Ordinance does not allow an Owner to evaluate a pattern of criminal misdemeanors stretching back more than three years.

113.     Renting to individuals with convictions for serious crimes is a legitimate concern for Owners.  Indeed, the Ordinance requires Owners to rent to individuals it would otherwise be prohibited from employing under Minnesota Statutes Section 299C.68, known as the Kari Koskinen law.  The Ordinance puts Owners, their managers and employees, and other tenants in danger.

114.     An Owner may even subject itself to civil liability from other tenants and/or employees that are harmed as a result of the Owner's rental to a tenant with a known criminal history.  Forcing Owners to take on this risk puts them in a precarious legal position.

115.     Under the Ordinance, Owners adopting the inclusive screening criteria method can still run the same credit history report, but now *cannot* reject an applicant for certain information identified within that report.

116.     Specifically, an Owner may not reject an applicant for a low "credit score by itself" or insufficient credit history.

117.     This requires an Owner to accept an applicant to rent a unit with no confidence that the applicant will be able to pay his or her rent.

118.     The Ordinance provides that an Owner may rely upon information contained within a credit report, so long as that information is "directly relevant to fitness

24

as a tenant," yet the Ordinance provides no definition for or examples of information it deems "directly relevant."

119.    An Owner who relies on information in a credit report it deems directly relevant to fitness as a tenant runs the risk that a City official or court will later determine that the information is not "directly relevant" and the Owner will have violated the Ordinance and subjected itself to possible criminal conviction, fines, loss of rental license, and other significant consequences.

120.    To make matters worse, the City is requiring Owners to turn a blind eye to credit history information without permitting Owners to take any extra security deposit to cover any risk it incurs in renting to a tenant with poor or insufficient credit history.

121.    Under the Ordinance, Owners adopting the inclusive screening criteria method can still request rental history information, but now *cannot* reject an applicant for certain information identified by the applicant.

122.    Additionally, under the Ordinance, an Owner cannot reject an applicant if he or she was previously evicted from a rental residence three (3) years prior to submitting the application.

123.    Thus, for instance, an owner might be forced to rent to an applicant who had been evicted from every rental residence he had ever inhabited, then lived the last three years with his parents in a house his parents owned.  This is true even if the eviction was the result of unlawful conduct, breach of the lease, damage to the property, or even terrorizing neighbors and staff.

124.    Under the Ordinance, if an Owner uses the 3x Income Test, the Owner must allow an exception to that requirement where the applicant can demonstrate successful payment of rent with income less than three (3) times the rent.

125.    The Ordinance does not require that the applicant's prior successful payment of rent be at a comparable rental rate or other circumstances.  For instance, if an applicant earning $2900 per month was successful at making lease payment of $1000 per month at a former apartment, an Owner would be prohibited from rejecting the applicant for an apartment renting for $2500 per month on the basis of inadequate income.

126.    The cumulative effect of the Ordinance's various provisions severely cripples an Owner's ability to avoid problem tenants and protect its other tenants, and is also profoundly unfair to applicants with exemplary records.  Under the Ordinance, an Owner using the inclusive screening criteria in 2020 is prohibited from making any distinction between Applicant A, who has never committed a crime, has never been evicted, has a high credit score of 800 and an income five (5) times higher than the rent, and Applicant B, who was convicted of first degree pre-meditated murder in 2009, convicted of second-degree manslaughter for a separate killing in 2012, convicted a number of times of running a house of prostitution with the latest conviction in 2016, evicted numerous times with the latest eviction in 2016, and has a low credit score of 425.

127.    The option to perform an individualized assessment does not resolve any of these issues.

128.    The required assessment involves a complex and cumbersome process in which Owners are required to consider whatever supplemental evidence or information the applicant provides.  Owners are required to consider the information the City tells them to consider, as opposed to industry-accepted standards in determining who will be a successful tenant for their property.

129.    This is an impracticable alternative for Owners that own a significant number of properties.  It would be time consuming, onerous, expensive, and inefficient to review supplemental information and evidence for a significant number of applicants. The Owner is required to essentially conduct a mini-hearing or a mini-parole board evaluation of the applicant's past.

130.    Even smaller Owners cannot take on this burden.  Where an Owner denies an applicant after an individualized assessment, the Owner is required to go to the expense of providing a written notice to every applicant within fourteen (14) days of its decision not to rent to that applicant, and each notice must explain the basis for the denial, list all supplemental information considered by the Owner, and explain each of the reasons that the supplemental information did not adequately compensate for the factors that informed the Owner's decision to deny the applicant.  For many Owners, this could mean devoting significant time and attention, including the cost of hiring legal counsel, to properly evaluate and prepare rejections of certain applicants.

**D.   The City of Minneapolis Offers No Clear or Valid Purpose or Justification for the Ordinance.**

131.   Although the Ordinance begins with a section entitled "Findings and purpose," that section does not state any purpose for the Ordinance or any goal the Ordinance is designed to achieve.

132.   The "Findings and purpose" section of the Ordinance also fails to identify any specific, clear justification for enacting the Ordinance.

133.   Instead, that section is discombobulated series of disconnected, disjointed, and unsubstantiated findings.

134.   Many of the "findings" in the Ordinance relate to the need for safe, affordable rental housing in Minneapolis.  The Ordinance does not include any assertion that it will increase the availability of safe, affordable rental housing in Minneapolis.  In fact, the effect of the Ordinance will be to decrease the availability of such housing.

135.   Many of the "findings" recite national or state-wide statistics, without any explanation how those statistics might relate to similar statistics for the population of Minneapolis or, more specifically, the population of rental housing applicants in Minneapolis.

136.   Furthermore, many of the "findings," such as that "[c]redit scores by themselves . . . do not necessarily predict the likelihood of paying rent on a regular and timely basis," are both inaccurate and unaccompanied by any indication of the basis for the "finding."

137. The City relied heavily upon a January 2019 non-profit housing study conducted in partnership with Wilder Research entitled "Success in Housing: How Much Does Criminal Background Matter?," authored by Cael Warren (the "Wilder Study").

138. Despite the City's reliance on the study, it does not justify the City's mandate for Owners to rent to applicants with recent, serious criminal convictions.

139. To the contrary, the Wilder Study focused on individuals who committed less serious crimes and focused on the narrow question of whether or not a person with a criminal record will commit the same or similar crime in the future. The crimes studied were less serious than those addressed by the Ordinance and the study failed to take into account individuals with multiple criminal convictions over a period of time.

140. Moreover, the Wilder Study focused predominately on properties with a high level of supportive services available to tenants, increasing their likelihood of a successful tenancy. While such services are provided by the non-profit housing providers studied, they are not provided by the for-profit Owners of market-rate housing that are governed by the Ordinance.

141. In addition, the Wilder Study used a baseline failure rate of 17%, meaning that 17% of the households studied (even those utilizing supportive services) did not have a successful tenancy. This baseline was used as the starting point for analyzing the impact of a criminal conviction. This baseline rate, however, is not indicative of the larger Minneapolis rental market. For the majority of Owners, if 17% of its tenants were unsuccessful and required eviction, they would not be able to profitably operate their businesses.

142.    Cael Warren, the author of the study, himself publicly announced: "While this study offers some rare insights into the relationship between criminal background and success in housing, there is still a great deal that we don't know.  For example: 1. We don't know if the results above can be applied to the rental population as a whole. . . . 2. We couldn't control for everything that contributes to housing outcomes, and we don't know how much that affects our results. . . . 3. We're not sure whether or how the impact of a given type of criminal background differs when a household committed more than one offense of that type. . . . 4. We don't know the impact of every kind of criminal background."  (*See* Cael Warren, "Criminal Background's Impact on Housing Success: What We Know (And What We Don't)," 7/16/19, attached as Exhibit "B").

143.    Moreover, the Ordinance states that the dates the Owner must consider are the "dates of sentencing."  If this means the date the judge imposed the sentence as opposed to the date of release from incarceration, this renders all research analyzing recidivism from the date of release largely irrelevant.

144.    The Wilder Study does not support the serious impositions placed on Owners by the Ordinance.

145.    In fact, offenders with criminal convictions have a high rate of recidivism, and it can take a significant amount of time for an offender to reach non-offender status.

146.    For example, in April 2014, the U.S. Department of Justice, Office of Justice, Bureau of Justice Statistics released a Report of a Study entitled "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010."  (A copy of the Report is attached as Exhibit "C").

147.    The U.S. Department of Justice reported that about two-thirds (67.8% ) of released prisoners were arrested for a new crime within three (3) years, and about three-quarters (76.6%) were arrested within five (5) years.

148.    In May 2019, the U.S. Department of Justice released another Report of a Study entitled "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)."  (A copy is attached as Exhibit "D").

149.    The U.S. Department of Justice reported that about half (1/2) of released sex offenders had a subsequent arrest that led to a conviction.

150.    In an attempt to justify the imposition of the individualized assessment, the Ordinance relies on the April 2016 United States Department of Housing and Urban Development guidance regarding the Fair Housing Act and the use of criminal history in tenant screening, stating that it found that individualized assessments are the "preferred mechanism for housing providers to fairly screen individuals with criminal history barriers" (the "2016 HUD Guidance").

151.    The 2016 HUD Guidance, however, has been widely denounced by housing providers and housing organizations, including those that are involved in developing and financing affordable housing solutions.

152.    Specifically, the HUD Guidance has been criticized as being contrary to Fair Housing obligations that require rental criteria to be uniformly applied to all applicants.  Even if individualized assessments were not expensive and time consuming, it is difficult to see how a rental company can provide individualized assessments and still ensure that all applicants are treated equally.

31

E.     **The Ordinance Does Not Achieve the City's Stated Goals**.

153.    To the extent the Ordinance seeks to create or provide more affordable

housing in Minneapolis, it does not do so.  To the contrary, the Ordinance will *increase*

the cost of doing business, leading to higher rents charged to tenants.  Renting to tenants

with low or non-existent credit scores, less than 3x income, and/or a history of evictions

will undoubtedly lead to a higher rent default rate.  The more defaults, the less income for

Owners, and the more they have to spread those costs to their other tenants through

increased rents.

154.    The same is true for property damage by tenants.  Renting to tenants with

serious criminal records will increase the instances of property damage.  The more

property damage, the more Owners have to spend on the properties, leading to increased

rents.

155.    Even if the Ordinance did not result in increases in rent, it would not create

additional affordable housing to remedy the shortage of such housing in Minneapolis.

Because it will not increase the amount of affordable housing, the Ordinance simply

reallocates existing affordable housing, taking it away from applicants with little or no

criminal history, few or no evictions, and good credit scores and allocating it instead to

applicants with serious criminal histories, past evictions, and low or nonexistent credit

scores.

156.    Additionally, the inability to rent to whom one chooses will inevitably lead

Owners and developers to either cease doing business in Minneapolis or not enter the

market in the first place, providing less housing overall and stunting Minneapolis's recent housing boom.

     **F.**      **The Ordinance is So Vague and Ambiguous That it is Impossible for an Owner to be Certain of Compliance.**

157.    To complicate matters even further, the Ordinance is so vague and ambiguous that proper compliance is impossible.

158.    At the outset, the Ordinance repeatedly refers to and regulates the conduct of "landlords," but at no point in the Ordinance or elsewhere in the Maintenance Code is the term "landlord" defined.  It is not clear to whom the Ordinance applies, and whether, for instance, all of the requirements of the Ordinance apply to a homeowner who wishes to rent one (1) room of his house to his brother or to a homeowner in the military who wishes to rent her home to a sister while the homeowner is stationed overseas or to a cohabiting couple where one person owns the house but the other contributes money toward the monthly mortgage payment.

159.    Moreover, Section 244.2030(b) of the Ordinance states that an Owner must make readily available to applicants the Owner's screening criteria "in as much detail as feasible."  There is no guidance as to what specific detail is required, what level of detail is required or what lack of information will be considered a violation of the Ordinance.

160.    Sections 244.2030(c)(1)(f), (g), and (h) of the Ordinance require the Owner to evaluate an applicant's criminal history record from the "dates of sentencing" for crimes committed.  The phrase "dates of sentencing" is not clear because it could be interpreted to mean the date the sentence was imposed, the date the sentence began to

run, the date the sentence ended, or some other date.  This lack of clarity makes it

impossible for an Owner to determine what date to use to evaluate an applicant's criminal

history to comply with the Ordinance.

161.    Moreover, it is not clear how Owners are to evaluate those convicted of

serious sexual conduct crimes.  On the one hand, Section 244.2030(c)(1)(g) allows an

Owner to reject an applicant if any member of the household has committed an offense

subject to a lifetime sex offender registration requirement.  On the other hand, Section

244.2030(c)(1)(h) requires an Owner to disregard first-degree criminal sexual conduct if

the "dates of sentencing" are over ten (10) years old.  When an Owner is presented with

an applicant convicted of first-degree sexual assault with dates of sentencing more than

ten (10) years old who is subject to a lifetime sex offender registration requirement, the

Owner cannot know whether it is allowed to reject the applicant on that basis or

prohibited from rejecting the applicant on that basis.

162.    Section 244.2030(c)(1)(h) allows an Owner to reject an applicant convicted

of specific felonies, including first-degree murder, for which the "dates of sentencing" are

less than ten (10) years old.  Section 244.2030(c)(1)(g) prohibits rejection of an applicant

for "any criminal conviction for felony offenses" if the dates of sentencing are more than

seven (7) years old.  It is impossible, for instance, for an Owner to determine whether it is

allowed to reject an applicant convicted of first-degree murder with "dates of sentencing"

eight (8) years old or whether it is prohibited from rejecting the applicant on that basis.

163.    Furthermore, it is unclear what criminal convictions for felony offenses are

excluded from the Ordinance based on mandated denial of tenancy in federally assisted

housing programs.  Section 244.2030(c)(1)(g) states that an Owner may not consider a

conviction for a felony offense for which the dates of sentencing are older than seven (7)

years unless that offense, *inter alia*, is one of "those same offenses that mandate denial of

tenancy in federally assisted housing subject to federal regulations . . . ."  The Ordinance

does not specify to which federally assisted housing program and/or federal regulations it

refers.  There is no guidance to the Owner to determine what criminal convictions fall

within this exception.  And an Owner who does not own federally assisted housing would

have no reason to be familiar with the offenses that mandate denial of tenancy in that

housing.

164.    Moreover, it is not clear what is meant when stated in Section

244.2030(c)(1)(a) that an Owner cannot consider "[a]ny arrest in an inactive case that did

not result in conviction."  There is no explanation as to whether the Ordinance's

reference to a "case" means a court case or simply a case of an arrest.  There is no

clarification as to when a "case" is "inactive."  Court records list cases as "open" or

"closed," but not as "inactive."  An Owner cannot know from the Ordinance, for instance,

whether an applicant who was arrested a week ago and released without any charges to

date can be rejected because there is an "active" case or cannot be rejected because the

case is "inactive" and there has been no conviction.

165.    In addition, as also noted above, Section 244.2030(c)(2)(a) states that an

Owner may not reject an applicant based on a low credit score "by itself" but may

consider information within a credit report that is "directly relevant to fitness as a tenant."

That language does not tell an Owner whether it may base a rejection on a low credit

score in conjunction with other information in the credit report that meets the "directly relevant" criteria, or whether it is prohibited from basing a rejection on a low credit score in all instances.

166.    That same section of the Ordinance provides no guidance as to what information in a credit report is "directly relevant to fitness as a tenant."  An Owner cannot know whether its subjective belief that some information is "directly relevant" is sufficient for compliance, or whether reasonable belief is required, or whether some other standard will be applied to determine either that the information is "directly relevant" or, conversely, that it is not "directly relevant" and the Owner has subjected itself to the significant consequences of having violated the Ordinance.

167.    Section 244.2030(c)(3)(a)(2) states that an Owner may not consider prior eviction if the eviction action "[w]as settled with no judgment or writ of recovery issued that was entered one (1) or more years before" the application.  An Owner trying to comply with this requirement has no way to know what must be "entered" to meet the time requirement.

168.    Section 244.2030(c)(3)(c) governing the income test permitted requires an Owner to allow exceptions from the 3x Income Test where the applicant can demonstrate "a history of successful rental payment" with a lower income.  There is no definition or guidance for an Owner to determine what constitutes a "successful" payment history.  In addition, there is no definition or guidance as to the length of time an applicant must have had "successful rental payment" in order for it to constitute a "history" under the Ordinance.

36

169.   Finally, Section 244.2030(g) governing enforcement of the Ordinance does not detail what penalties will be imposed for non-compliance with the Ordinance. Specifically, the Ordinance states that failure to comply "may result in criminal prosecution, adverse license action, and/or administrative fines, restrictions, or penalties . . . ." It does not define what criminal penalties may be imposed, what adverse rental license actions may be taken, what administrative fines may be imposed, and/or what other fines, restrictions, or penalties are possible.  To complicate matters even further, the Ordinance states that these penalties may be imposed without any notice of violation. The consequences are severe, unknown, and without warning.

170.   The Ordinance itself acknowledges these problems, promising that "*[p]rior to the effective date*, the city will convene a cross-sector implementation committee to create and *execute an implementation plan* . . . . The committee will determine *best practices and policies* for ordinance implementation, including the creation of relevant *screening templates* for legal screening options including individualized assessment, and create an *outreach and engagement plan*."  (Emphasis supplied).

171.   Though the City convened an implementation committee, that committee failed to create or execute any implementation plan, determine best practices and policies for ordinance implementation, create screening templates for legal screening options, or create an outreach and engagement plan prior to the effective date of the Ordinance, and has also failed to do so at any time prior to the filing of this complaint.

## CAUSES OF ACTION

### COUNT ONE
### Unconstitutional Taking
### U.S. Const. Amend. V, Amend. XIV and Minn. Const. Art. I, § 13
### 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202

172.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

173.    The Fifth Amendment of the United States Constitution, applicable to state action under the Fourteenth Amendment, and Article I, Section 13 of the Minnesota Constitution provide that private property shall not be taken for public use without just compensation.

174.    By enacting the Ordinance, the City has seized Plaintiffs' and other Owners' property without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution.

175.    If Plaintiffs and other Owners continued to lease their property to their choice of tenants, based upon all the information they deem necessary to determine the suitability and qualifications for their choice of tenants, Plaintiffs and other Owners would be in violation of the Ordinance.  The unstated goal of the Ordinance is to require Owners to lease their property to individuals to whom they would not otherwise allow access.

176.    The entry upon property without the voluntary consent of the owner is a physical invasion of property and a trespass.  The invasion is substantial in that the tenant

38

enjoys exclusive possession of the property over an extended period.  As such, forcing Owners to allow individuals to occupy their property is a physical taking.

177.    Beyond that, where the government restricts a fundamental right intrinsic to landowners, there is an unconstitutional taking.

178.    Even if the Ordinance did not result in Owners renting to individuals they would otherwise exclude, dictating the screening criteria and how they may be applied substantially interferes with the right to control access to property.

179.    The Ordinance is not an exercise of the City's police or land use regulatory powers.  It does not address the safe use of apartments or provide for the orderly development of the City.  To the contrary, the Ordinance is plainly intended to use Owners' property to advance some unspecified societal purpose.  The burdens imposed are not extended to society as a whole and cannot be imposed without just compensation.

180.    The ability to conduct an individualized assessment does not ameliorate this restraint because it mandates a complex, cumbersome, and expensive process in which Owners must consider whatever information applicants provide.  This further dictates the information Plaintiffs and other Owners must consider and prohibits them from considering only those factors they believe pertinent to who possesses or enters their property.

181.    In addition, the Ordinance imposes a significant economic burden on Plaintiffs and other Owners.  The Ordinance diminishes the ability of Plaintiffs and other Owners to recover rent and make money on their investments in their properties.  The

Ordinance diminishes the overall economic value of the property by allowing undesirable tenants to rent Plaintiffs' and other Owners' properties.

182.    The Ordinance interferes significantly with Plaintiffs' and other Owners' investment-backed expectations for their property.  Plaintiffs and other Owners expect to rent their property to tenants and to make money on rental payments from such tenants. Plaintiffs and other Owners expect that they have the ability to select their tenants of choice, on a non-discriminatory basis, and to assess applicants on relevant factors to their suitability as tenants, including based on credit history, criminal history, and other factors.  The Ordinance interferes with these expectations on which Plaintiffs and other Owners have made their investments.

183.    Any governmental interests that precipitated the Ordinance may be achieved through less onerous means and in a way that respects Plaintiffs' and other Owners' fundamental property rights and places any burdens necessary to achieve those interests on society generally rather than solely on Plaintiffs and other Owners.

184.    The City has failed to offer any just compensation or any method of seeking compensation for this taking.

185.    These violations of the Fifth Amendment to the United States Constitution and Article I, Section 13 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

186.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution.

187.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT TWO**
**Substantive Due Process – Unconstitutional Deprivation of Property Rights**
**U.S. Const. Amend. XIV and Minn. Const. Art. I, § 7**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

188.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

189.    The Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution provide that states shall not deprive any persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV; Minn. Const. art. I, § 7.

190.    The Ordinance deprives Plaintiffs and other Owners of their rights to due process under Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

191.    Under the Due Process clause, Plaintiffs and other Owners are entitled to heightened protection against governmental interference with their fundamental right to liberty, including those fundamental rights and liberties which are objectively and deeply rooted in the Nation's history and tradition.  Such rights include property rights.

41

192.    A fundamental right inherent in the ownership of property is the right to exclude others from your property.

193.    By requiring Plaintiffs and other Owners to rent their properties to certain tenants without full consideration of that tenant's criminal history, credit, or rental history, the Ordinance denies them of their fundamental right to property and their fundamental right to exclude unwanted persons from their property.  If Plaintiffs and other Owners continue to lease their property to their choice of tenants, based upon all the information they deem necessary to determine the suitability and qualifications for their choice of tenants, they will be in violation of the Ordinance.  Therefore, the City is mandating who may physically occupy Plaintiffs' and other Owners' property and impermissibly restricting their fundamental property rights.

194.    The Ordinance's deprivation of fundamental rights is not justified by any compelling governmental interest.

195.    The Ordinance is not narrowly tailored to serve any compelling governmental interest.

196.    The City's governmental interests are not achieved in any meaningful way by the Ordinance.

197.    The Ordinance violates Plaintiffs' and other Owners' due process rights.

198.    The Ordinance expressly mandates that Plaintiffs and other Owners must rent their properties to certain individuals, preventing them from using their properties in the manner they wish.

199.    The Ordinance is not rationally related to a legitimate government interest.

200.    These violations of the Fourteenth Amendment to the United States

Constitution and Article I, Section 7 of the Minnesota Constitution give rise to both

declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

201.    Plaintiffs are entitled to a declaration from this Court that the Ordinance

violates the Fourteenth Amendment of the United States Constitution and Article I,

Section 7 of the Minnesota Constitution.

202.    Plaintiffs have no adequate remedy at law for the harm caused by the

Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and

other Owners will be irreparably injured, as they will be deprived of their rights under the

United States Constitution and the Minnesota Constitution, will continue to suffer

substantial loss of rents, profits, and good will, the nature and extent of which is

impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT THREE**
**Unconstitutional Compelled Content-Based Speech**
**U.S. Const. Amend. I and Minn. Const. Art. I, § 3**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

203.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at

length herein.

204.    Plaintiffs and other Owners have the right, under the First Amendment of

the United States Constitution and Article I, Section 3 of the Minnesota Constitution to

control the content of their speech and to not be compelled to speak.

205.    The City's enactment and enforcement of the Ordinance restricts these rights by controlling the content of what Plaintiffs and other Owners say, compelling them to speak, and compelling the content of that speech.

206.    The Ordinance requires Owners to communicate specific screening criteria to applicants.  Minneapolis Ordinance § 244.2030(b).

207.    The Ordinance requires Owners to notify applicants rejected under the inclusive screening criteria of the specific bases for rejection.  *Id.* § 244.2030(e)(1)).

208.    The Ordinance requires Owners to notify applicants rejected under the individualized assessment of the specific bases for rejection and the supplemental evidence considered and rejected in making their decision.  *Id.* § 244.2030(e)(2)).

209.    These content-based speech mandates of the Ordinance are not justified by any compelling state interest.

210.    These content-based speech mandates are not narrowly tailored to serve any purported compelling government interest.

211.    The City's governmental interests are not achieved in any meaningful way by the Ordinance.

212.    The speech mandates of the Ordinance do not serve or advance a substantial government interest.

213.    The speech mandates of the Ordinance restrict Plaintiffs' and other Owners' First Amendment and Minnesota Constitution rights more extensively than necessary to serve the City's governmental interests.

214.    These violations of the First Amendment to the United States Constitution and Article I, Section 3 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

215.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution.

216.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

**COUNT FOUR**
**Due Process - Void for Vagueness**
**U.S. Const. Amend. XIV and Minn. Const. Art. I, § 7**
**42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202**

217.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth at length herein.

218.    The Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution provide that states shall not deprive any persons of life, liberty, or property without due process of law.  U.S. Const. Amend. XIV; Minn. Const. art. I, § 7.

219.    The Ordinance deprives Plaintiffs and other Owners of their rights to due process under Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution because it is unconstitutionally vague.

220.    A penal statute or ordinance must define the criminal offense with a sufficient definiteness so that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

221.    When a vague statute or ordinance implicates First Amendment rights, as the Ordinance does here, the statute or ordinance is unconstitutional if it fails to give a person of ordinary intelligence fair notice that his conduct is forbidden by the statute or ordinance or where it authorizes or encourages arbitrary and discriminatory enforcement.

222.    As set forth in detail above, the Ordinance is unconstitutionally vague in many key respects.

223.    The Ordinance makes non-compliance a crime, but does not clearly define that crime with a level of definiteness to inform Owners what conduct is prohibited.

224.    Exacerbating these problems, the Ordinance states that criminal penalties (as well as other penalties) may be imposed for non-compliance, even without notice of a violation of the Ordinance.  This lack of notice wholly deprives Plaintiffs and other Owners of the ability to ascertain what is required for full compliance with the Ordinance and thus deprives Plaintiffs and other Owners of due process of law.

225.    These violations of the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution give rise to both declaratory and injunctive remedies under 28 U.S.C. §§ 2201 and 2202.00.

46

226.    Plaintiffs are entitled to a declaration from this Court that the Ordinance violates the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

227.    Plaintiffs have no adequate remedy at law for the harm caused by the Ordinance.  Unless the City is enjoined from enforcing the Ordinance, Plaintiffs and other Owners will be irreparably injured, as they will be deprived of their rights under the United States Constitution and the Minnesota Constitution, will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which is impossible to ascertain, and will unnecessarily subject their tenants to unsafe situations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant them relief as follows:

228.    Declaring Minneapolis Ordinance 244.2030, governing applicant screening for applicants, to be invalid and unenforceable because:

    a.  It is a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution;

    b.  It deprives Plaintiffs and other Owners of fundamental property rights in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

     c.   It compels Plaintiffs' and other Owners' speech in violation of the First Amendment of the United States Constitution and Article I, Section 3 of the Minnesota Constitution; and

     d.   It is void for vagueness under the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

229.   Enjoining the City of Minneapolis from taking any action to implement or enforce Minneapolis Ordinance 244.2030;

230.   Awarding Plaintiffs just compensation for unlawful takings in an amount to be proven at trial;

231.   Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and any other applicable sources of law; and

232.   Granting Plaintiffs such other and further relief as this Court deems proper.

COZEN O'CONNOR


*/s/ Mark Jacobson*
Mark Jacobson (#0188943)
E-mail: mjacobson@cozen.com
Steven Katkov (#0202769)
E-mail: skatkov@cozen.com
Cassandra M. Jacobsen (#0400120)
E-mail: cjacobsen@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000

Robert Hayes (PA #33099)
(*pro hac vice* admission pending)
E-mail: rhayes@cozen.com
Calli Padilla (PA #312102)
(*pro hac vice* admission pending)
E-mail: cpadilla@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000

*Attorneys for Plaintiffs*

Dated:   September 4, 2020