UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

301, 712, 2103 AND 3151 LLC; 12
TWENTY-SECOND AND 1827 LASALLE
LLC; 137 EAST SEVENTEENTH STREET
LLC; 1522 LASALLE AVENUE LLC; 1728
SECOND AVENUE AND 1801 THIRD
AVENUE LLC; 1806 AND 1810 THIRD
AVENUE LLC; 1816, 1820 AND 1830
STEVENS AVENUE LLC; 1817 SECOND
AVENUE LLC; 1900 AND 1906 CLINTON
AVENUE LLC; 1924 STEVENS AVENUE
LLC; 2020 NICOLLET AVENUE LLC;
2101 THIRD AVENUE LLC; 2323 AND
2401 CLINTON AVENUE LLC; 2417, 2423
AND 2439 BLAISDELL AVENUE LLC;
2427 BLAISDELL AND 2432 FIRST
AVENUE LLC; 25 TWENTY-FIFTH
STREET LLC; 2535 CLINTON AVENUE
LLC; 2545 BLAISDELL AVENUE LLC;
2609 HENNEPIN AVENUE LLC; 2633
PLEASANT AVENUE LLC; 2720
PILLSBURY AVENUE LLC; 2738 AND
2750 PILLSBURY AVENUE LLC; 2809
PLEASANT AVENUE LLC; 600
FRANKLIN AVENUE LLC; AMY SMITH;
BLAISDELL 3322, LLC; BLOOMINGTON
4035, LLC; BRYANT AVENUE
PROPERTIES LLC; COLFAX
APARTMENTS LLC; COLFAX VILLAS I,
LLC;  DUPONT PROPERTIES LLC;
FLETCHER PROPERTIES, INC.;
FRANKLIN VILLA PARTNERSHIP,
L.L.P.; FREMONT APARTMENTS, LLC;
FREMONT TERRACE APARTMENTS,
L.L.C.; GARFIELD COURT
PARTNERSHIP, L.L.P.; GASPARRE NEW
BOSTON SQUARE, LLC; GATEWAY
REAL ESTATE, L.L.C.; JEC PROPERTIES,
LLC; LAGOON APARTMENTS, LLC; LL
LLC; NORTHERN GOPHER

Case No. 0:20-cv-01904 (PAM/BRT)


**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

ENTERPRISES, INC.; PATRICIA L.
FLETCHER, INC.; and RAY PETERSON,

          Plaintiffs,

v.

CITY OF MINNEAPOLIS,

          Defendant.

## I.   PRELIMINARY STATEMENT

1776 was not just the year in which a nation was born. It was also the year of the birth of an entirely new concept of the right to govern. One conceived in the rejection of the old world's belief in the divine right of monarchs. Based, instead, on the notion that all rights reside in the people so that all government exists only through the consent of the governed. And, the recognition that there are rights of which no government, not even one freely elected, or how good its intentions, may deprive its citizens—certainly not without due process. Individuals' right to life, right to liberty and right to be secure in their property.

In the Federalist, James Madison wrote that "[g]overnment is instituted no less for the protection of the property than of the persons of individuals."  The Federalist No. 54 (James Madison). The framers of the Constitution understood this well. Alexander Hamilton is reported to have proclaimed at the 1787 Constitutional Convention that "one great obj[ect] of Gov[ernment] is the personal protection and security of property". Rufus King's notes on Hamilton's speech.[1]  Furthering this view, James Madison proposed that

---

[1] Hamilton's speech was not written or captured except by the notes of observers, including King, Lansing, Yates and Madison.

the litmus test of effective government should be whether its citizens' "property has remained safe against the predatory spirit of licentious adventurers". The Federalist No. 41 (James Madison).

Just over a decade after the Declaration of Independence, these core rights were enshrined in the Bill of Rights. Authored by Madison, the Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  That Amendment also prohibits depriving citizens of "life, liberty or property without due process of law."  The Fourth Amendment's prohibition of unreasonable searches and seizures provides an additional shield from government intrusions onto private property.

This is not be a quaint reflection on a bygone era. Courts have consistently reaffirmed property owners' Constitutional right to be secure in their property. In 1994, in a Takings Clause case, the Supreme Court held that one of the principal constitutional safeguards for private property owners is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Dolan v. City of Tigard, 512 U.S. 374, 384 (1994)(citing Armstrong v. United States, 364 U.S. 40, 49, (1960)). These rights must be as vibrant and real a concern today as they were in the 1780s. They are, after all, the fundamental underpinnings of American society.

Plaintiffs, a cross-section of owners of multi-family residential leasing units, have commenced this action to enjoin the enforcement of the City of Minneapolis's so-called Renter Protection Ordinance (Minneapolis, Minnesota, Code of Ordinances § 244.2030,

the "Ordinance", Exhibit "A" to Declaration of M. Jacobson ("Jacobson Decl.")) because it violates these fundamental constitutional limitations. It effects an unconstitutional taking of Plaintiffs' and other owners of multi-family residential leasing units' ("Owners") property. The Ordinance burdens Owners' fundamental property rights by constraining the screening criteria they may consider in evaluating potential tenants. These criteria include major felony convictions, low credit scores, insufficient credit history and past evictions. By imposing these constraints, the Ordinance limits Owners' choice and is plainly intended to force them to rent to individuals they otherwise would have rejected. Its rambling, disjointed statement of findings and purpose shows that these constraints are imposed in an effort to ameliorate perceived societal issues. For example, it is claimed that seventy-five percent of low income households are "housing burdened" and that there is disproportionate incarceration rate of African Americans and Hispanics. Limiting Owners' property rights to address low income individuals' ability to obtain adequate housing or disproportionate criminal conviction rates imposes burdens upon them that should be borne by society as a whole.

Even if the Ordinance does not rise to the level of a constitutional taking, it certainly deprives Owners of their property rights without substantive due process. By randomly citing a panoply of purported societal ills, the Ordinance fails to identify what legitimate governmental interest it is supposed to serve. And, it does not substantially, or even rationally, advance even one of these purported societal issues. For instance, it is claimed that the "persistent low vacancy rate, increases in rent, and stagnant wages for renters have made it difficult for renters to afford safe affordable housing in Minneapolis . . ."

Ordinance § 244.2030(a)(2). But, the Ordinance does not provide for more housing, rent support, or higher wages. It is also difficult to discern how its apparent goal of facilitating certain segment of society's ability to obtain housing will resolve a general housing shortage. Similarly, how limiting consideration of an applicant's criminal background will make multi-family buildings safer is certainly a mystery. Beyond that, the Ordinance will just increase the number of rent-burdened tenants, which is contrary to its stated goals and do nothing but make matters worse by increasing the likelihood of default or eviction – a factor that may, at least in some instances, be considered in denying a rental application even under the Ordinance.

Beyond its substantive defects, the Ordinance is unconstitutionally vague. While imposing potential criminal penalties and license forfeiture penalties, it does not adequately specify the prohibited conduct. For instance, the Ordinance provides that an Owner utilizing more restrictive screening criteria than specified therein must conduct an individualized assessment of any basis upon which it intends to deny an application and "must accept and consider" all "explanatory evidence" the applicant submits. Ordinance § 244.2030(d). What is meant by "consider[ing]" this evidence is uncertain. Is simply reading whatever is provided sufficient, or must the Owner give it greater weight? The Ordinance's identifying factors that should be "considered" in this process do not clarify this ambiguity. Even the Ordinance's enforcement provisions are vague in that it does not specify under what circumstances a violation may result in criminal prosecution or license forfeiture or what specific criminal penalties may be imposed.

This seriously flawed and unconstitutional Ordinance cannot remain in force – not even until a trial on the merits can be held. Plaintiffs accordingly move for the entry of a Preliminary Injunction prohibiting the enforcement of the Ordinance pendite lite. That Motion should be granted.

## II.   FACTS

### A.   THE MINNEAPOLIS RESIDENTIAL LEASING MARKET IN MINNEAPOLIS

Plaintiffs each own multi-unit buildings in Minneapolis that are leased for residential use. Plaintiffs constitute a broad spectrum of residential landlords in the City. (Declaration of J. Rubin ("Rubin Decl."), ¶¶ 1-24; Declaration of L. Stefaniak ("Stefaniak Decl."), ¶¶ 1-4; Declaration of T. Fletcher ("Fletcher Decl."), ¶ 1; Declaration of A. Smith ("Smith Decl."), ¶ 1). They include Owners of multiple and limited numbers of units and different categories of buildings and units. (*Id.*). Each has joined in this action because the Ordinance is an untenable intrusion upon their right to qualify the tenants to whom they will rent. (Rubin Decl., ¶¶ 38-60; Stefaniak Decl., ¶¶ 15-36; Fletcher Decl., ¶¶ 9, 11; Smith Decl., ¶¶ 13-24).

It is crucial to Owners to lease to tenants who will and can honor the terms of their lease. (Rubin Decl., ¶ 26). Individuals not infrequently desire an apartment beyond their means, cannot control their finances or suffer adverse financial circumstances during the lease. (*Id.*, ¶ 59). In those circumstances, they default or are repeatedly delinquent in meeting their lease payments. (*Id.*). Prospective tenants may also be unstable, dishonest or disruptive. (*Id.*, ¶ 28). While in exclusive possession of property, tenants may damage the

property. (*Id.*, ¶ 27). They may also pose a threat to the personal safety and well-being of neighboring tenants and management or janitorial personnel and disturb neighboring tenants' quiet enjoyment of their residence. (*Id.*, ¶ 28).

Often without anywhere else to live, defaulting or disruptive tenants often refuse to vacate the premises. (*Id.*, ¶ 29). As leases involve the demise of an interest in property, tenants can be forcibly removed through a costly, time-consuming and extended eviction process. (*Id.*, ¶ 30). During this period, unpaid rents mount and the tenants may further damage the premises and threaten other tenants and the Owners' employees. (*Id.*, ¶ 31).

Owners certainly seek to avoid these circumstances. (Rubin Decl., ¶ 34; Stefaniak Decl., ¶ 11; Fletcher Decl., ¶ 9; Smith Decl., ¶ 9). Extended defaults deprive Owners of any income from the property and expose Owners to extensive legal costs while its obligations under its financing continue. (Rubin Decl., ¶ 29). Repeated tenant defaults, evictions and damage to premises can accordingly be financially devastating. (Rubin Decl., ¶ 32). Further, Owners naturally also wish to avoid their tenants and employees being harmed or disturbed. (*Id.*, ¶ 42). They also may be held liable for any resulting physical harm or property harm their tenants may cause. (*Id.*, ¶ 33).

Each of the Plaintiffs, and virtually all residential landlords, establish screening criteria for prospective tenants predictive of a tenants' likelihood of defaulting, damaging the premises or engaging in anti-social or disruptive conduct. (Rubin Decl., ¶¶ 34-36; Stefaniak Decl., ¶¶ 11-13; Fletcher Decl., ¶¶ 9-11; Smith Decl., ¶¶ 9-11). These criteria include an applicant's criminal record, credit score and history, history of past evictions and prior rental history. (*Id.*). Owners (or their management companies), particularly

7

Owners of many units, typically develop weighted matrixes of screening criteria that are applied objectively to qualify a tenant applicant. (Rubin Decl., ¶ 35; Stefaniak Decl., ¶ 12). While some factors may be completely disabling, such as conviction of a violent felony, the number, recency and other extenuating factors may be factors into the evaluation of other screening criteria. (Rubin Decl., ¶ 40; Stefaniak Decl., ¶ 17). The vast majority of Owners consider all of these criteria, but the weighting and consideration of extenuating factors vary between Owners. (*See id.*).

**B.     THE MINNEAPOLIS ORDINANCE**

In September 2019,[2] the City enacted the Ordinance constraining Owners' control of access to their property. *See* Ordinance, Exhibit "A" hereto. Setting forth a litany of perceived social ills, the Ordinance provides that, prior to accepting rental applications, Owners "must make readily available to all applicants the landlord's rental screening criteria in as much detail as is feasible." *Id.*, § 244.2030(b). Those screening criteria may not provide for the rejection of applicants for a number of specified reasons unless the Owner conducts the individualized assessments specified in Section 244.2030(d). Ordinance, §§244.2030(a) and (c).

The reasons for which Owners may not reject applicants include prior criminal convictions under numerous circumstances, including:

> e.     Any  conviction  or  any  other  determination  or

---

[2] The Ordinance became effective June 1, 2020, except for property owners with fifteen (15) dwelling units or less, for which the effective date is December 1, 2020. *Id*., § 244.2030(i).

adjudication in the juvenile justice system;

f.      Any conviction for misdemeanor offenses for which the dates of sentencing are older than three (3) years;

g.      Any criminal conviction for felony offenses for which the dates of sentencing are older than seven (7) years; however, a landlord may deny an applicant who has been convicted of the illegal manufacture or distribution of a controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802) or for those same offenses that mandate denial of tenancy in federally assisted housing subject to federal regulations, including but not limited to when any member of the household is subject to a lifetime sex offender registration requirement under a state sex offender registration program; or

h.      Any criminal conviction for the following felony offenses for which the dates of sentencing are older than ten (10) years: first-degree assault (Minnesota Statutes Section 609.221), first-degree arson (Minnesota Statutes Section 609.561), aggravated robbery (Minnesota Statutes Section 609.245), first-degree murder (Minnesota Statutes Section 609.185), second-degree murder (Minnesota Statutes Section 609.19), third-degree murder (Minnesota Statutes Section 609.195), first-degree manslaughter (Minnesota Statutes Section 609.20, subd. 1, 2, and 5), kidnaping (Minnesota Statutes Section 609.25, subd. 2(2)), or first-degree criminal sexual conduct (Minnesota Statutes Section 609.342, subd. 1(b) and (g)).

*Id.*, §§ 244.2030(c)(1)(e)-(h).

The Ordinance furthermore provides that an Owner may not reject an applicant (1) based on credit score "by itself," although it may rely upon "information within a credit report that is directly relevant to fitness of a tenant," or (2) "[i]nsufficient credit history, unless the applicant in bad faith withholds credit history information that might otherwise form a basis for denial." *Id.*, § 244.2030(c)(2).

The limitations the Ordinance imposes extend to rental history. It provides that an

Owner may not reject an applicant based upon:

    a.    An eviction action pursuant to Minnesota Statutes Chapter 504B if the action:

        1.    Was dismissed or resulted in a judgment for the applicant before the applicant submits the application;

        2.    Was settled with no judgment or writ of recovery issued that was entered one (1) or more years before the applicant submits the application;

        3.    Resulted in a judgment against the applicant that was entered three (3) or more years before the applicant submits the application; or

    b.    Insufficient rental history, unless the applicant in bad faith withholds rental history information that might otherwise form a basis for denial.

    c.    If a landlord uses a minimum income test requiring an income equal to three (3) times the rent or higher, the landlord must allow an exception to that test where the applicant can demonstrate a history of successful rent payment with an income less than three (3) times the rent.

*Id.*, § 244.2030(c)(3).

If an Owner denies an application based on inclusive screening criteria, it must notify the applicant within 14 days of the rejection and the specific criteria the applicant failed to meet. *Id.*, § 244.2030(e)(1). Before rejecting an application on the basis of the applicant's criminal history, even under the limited circumstances permitted by the Ordinance's inclusive screening criteria, an Owner must also consider any supplemental evidence provided by the applicant at the time of application. *Id*., § 244.2030(e)(1).

Moreover, subdivision (d) provides that:

> A landlord that applies screening criteria that are more prohibitive that the inclusive screening criteria set forth in subdivision (c) must conduct an individualized assessment for any basis upon which the landlord intend to deny an application. In evaluating an applicant suing individualized assessment, a landlord must accept and consider all supplemental evidence provided with a completed application to explain, justify, or negate the relevance of potentially negative information revealed by screening.

*Id.*, §244.2030(d). The Owner must consider the nature and severity as well as the number and type of the incidents, the time elapsed since the date the incidents occurred, and the age of the individual at the time the incidents occurred. *Id.* The Owner must notify each such applicant in writing within 14 days of any rejection, providing both the basis for the denial and an explanation of the reasons why the supplemental evidence, if provided, did not adequately compensate for the factors which caused the Owner's rejection, as well as a list of all supplemental evidence considered. *Id.*, §244.2030(e)(2).

Subdivision (g) provides that "failure to comply with the provisions of this section 244.2030 may result in criminal prosecution, adverse rental license action, and/or administrative fines, restrictions, or penalties as provided in chapter 2 of this Code." *Id.*, § 244.2030(g). Despite the severity of these consequences, and the vast array of potential punishment, these penalties may occur without any notice of violation to the Owner. *Id.* Additionally, any tenant aggrieved by a landlord's noncompliance with this section may seek redress in any court of competent jurisdiction to the extent permitted by law." *Id.*

## III. <u>LEGAL ARGUMENT</u>

### A. STANDARD OF REVIEW

The Court has broad power to grant preliminary injunctive relief to prevent irreparable injury by maintaining the status quo until a decision may be rendered on the

merits. *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); Fed. R. Civ. P. 65(a)(1). Four factors are considered in determining the appropriateness of injunctive relief: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)(en banc). No single factor is dispositive, and the court must balance the factors to determine whether justice requires intervention. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Hill v. Xyquad*, 939 F.2d 627, 630 (8th Cir. 1991).

However, "probable success on the merits, is frequently considered the most important" factor. *Am. Dairy Queen v. New Line Prod., Inc.,* 35 F. Supp. 2d 727, 729 (D. Minn. 1998). When, as here, the validity of a law or regulation is at issue, the "balance-of-harm and public-interest factors need not be taken into account" because the government suffers no harm and "the public interest will perforce be served" by enjoining enforcement of an invalid law. *Bank One, Utah Nat'l Ass'n v. Guttau*, 190 F.3d 844, 847–48 (8th Cir. 1999).

Each factor weighs in favor of Plaintiffs' request for an injunction relating to the enforcement of the Ordinance until this litigation is resolved.

**B.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS[3]**

> **1.    The Ordinance is an Unconstitutional Taking of Plaintiffs' and other Owners' Property**

The Fourteenth Amendment extends the Takings Clause's prohibition of taking private property for public use without just compensation to the states. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005). The Minnesota Constitution provides similar protection by directing that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation."  Minn. Const. art. I, § 13.

An unconstitutional taking occurs when government action interferes with a property owner's exercise of any of the bundle of rights intrinsic to property ownership. *See, e.g.*, *Hodel v. Irving*, 481 U.S. 704 (1987) (the right to transfer property by devise or intestacy). One of those rights is the power to exclude. *See Kaiser Aetna v. U.S.*, 444 U.S. 164, 176 (1979) ("[T]he owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property-the right to exclude others."); *see also PruneYard Shopping Ctr. v. Robbins*, 447 U.S. 74, 82 (1980) ("It is true that one of the essential sticks in the bundle of property rights is the right to exclude others."); *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting) ("[A]n essential element of individual property is the legal right to exclude others from enjoying it."); Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 63

---

[3] At this point, Plaintiffs only move with respect to the claims referenced below. It is submitted that they are likely to succeed on the remaining claims set forth in their Complaint and reserve all rights and remedies with respect to those claims.

(1985) (describing "[t]he notion of exclusive possession" as "implicit in the basic conception of private property").

The Supreme Court has accordingly held "that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation." *Kaiser*, 444 U.S. at 179-80. *See also*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982). The reason for the interference is immaterial. *Id.* at 426. That is because, as set forth previously, the Takings Clause bars government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Dolan v. City of Tigard*, *supra*.

The Ordinance interferes with Owners' right to exclude others from their property by limiting screening criteria. Generally, and as set forth in detail previously, juvenile dispositions, no matter how repeated or serious, may never be considered. Misdemeanor and felony convictions may not be considered more than three years and more than 7-10 years after the date of sentencing, respectively. Additionally, neither credit scores by themselves nor lack of credit history may be considered and the right to consider adverse rental history is constrained. If an Owner imposes an income requirement of three or more times the rent, it **must** allow an exception if prospective tenants can demonstrate they were able to meet rent obligations of three or more times their income. The Ordinance thereby substitutes government mandated screening criteria for those Owners believe most predictive of a prospective tenants' likelihood to default, damage the premises or pose a threat to others.

While the Ordinance facially allows Owners to apply broader screening criteria if they conduct "individualized assessments," that option is actually illusory. While the individualized assessment provision is generally vague—an independent constitutional infirmity—subdivision (d) requires landlords to conduct "an individualized assessment for any basis upon which the landlord intends to deny an application" if it applies screening criteria more prohibitive than the Ordinance specifies. Ordinance, §244.2030(d). As the Ordinance requires an individual assessment "for any basis upon which the landlord intends to demy an application," it appears to require an assessment even if the more prohibitive criteria were not the basis of the denial. In conducting the assessment, the Owner must "accept and consider" all supplemental evidence provided with a completed application. "Supplemental evidence" is defined to mean "any written information submitted by the applicant in addition to that provided on the landlord's form application that the **applicant believes to be relevant to the applicant's predicted performance as a tenant.**" *Id.* (emphasis added). That turns property ownership on its head by taking control of deciding what factors will be considered in allowing an applicant access to property from the owner and giving it to the applicant. What constitutes "consider[ing]" supplemental evidence is another area where the Ordinance is vague, but presumably the Owner must give it some weight. Otherwise, individualized assessment would be meaningless. Beyond that, if the Owner denies the application, it must explain in writing why the supplemental evidence did not "adequately compensate for the factors that informed the landlord's decision to reject the application." *Id.*, §244.2030(e)(2).

15

The net effect is that Owners may not utilize general screening criteria more prohibitive than specified in subdivision (c) of the Ordinance. For example, even if there were only a minute risk of an arsonist starting a fire at the demised premises, an Owner may not refuse to accept this risk and enforce a blanket policy against leasing to anyone convicted of arson because the Owner would have to "consider" whatever supplemental evidence the arsonist offered. Similarly, Owners may not universally refuse to lease to anyone convicted of any crime, no matter how violent, or with an adverse credit score, regardless of how low.

Moreover, "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 426. (statute requiring landlords to install cable television facilities amounted to a taking despite the facilities' small size). *See also*, *Lingle*, 544 U.S. at 536 (the permanent physical invasion of property by the government is a *per se* taking, no matter its size or scale); *Spaeth v. City of Plymouth*, 344 N.W.2d 815, 821 (Minn. 1984) ("Where government action results in a permanent physical appropriation or occupation of property, there certainly has been a taking.")

The Ordinance's plain goal is to compel Owners to rent to applicants they might otherwise reject. It achieves that objective. Plaintiffs' screening criteria are not uniform, but every plaintiff applies, at least, some criteria more prohibitive than the Ordinance authorizes. For example, credit scores below a set minimum are automatically disqualifying for most Plaintiffs. (*See, e.g.,* Rubin Decl., ¶ 51). Plaintiffs often typically will not lease to individuals convicted of violent crimes and exclude individuals with

16

prostitution convictions to avoid the risk of a tenant attracting solicitors to the premises. (Rubin Decl., ¶¶ 40-48; Stefaniak Decl., ¶¶ 17-25).

Moreover, the Ordinance will inevitably force Owners to rent to tenants just released from prison because it permits consideration of a conviction for periods often less than the typical sentence for the specified crime and commencing on the date of sentencing. (*See Id.*). Assuming the date of sentencing is when a judge imposes the sentence, the running on the period during which the conviction may be considered will often commence before the prospective tenant is incarcerated and may expire before the applicant is even released from prison. As an example, the Ordinance permits murder convictions to be considered for ten years after the date of sentencing, but the typical sentence for murder exceeds ten years. As such, Owners may not consider a murder conviction from the moment the convict is released from prison. Even the Ordinance recognizes that the risk of a person convicted of a crime only diminishes "over time", and the risk of an inmate committing another crime is highest immediately after the release from prison. So, Plaintiffs typically will not lease to recently released inmates. (*See, e.g.,* Rubin Decl., ¶¶ 40, 44-47; Stefaniak Decl., ¶ 17).

Perhaps most disturbingly, the Ordinance's absolute prohibition of considering a conviction after the specified number of years means they cannot be considered for any purpose – even to screen out applicants with multiple convictions. Once the specified time period has elapsed, a conviction cannot be considered even as part of multiple convictions. Owners may be required to rent to applicants with a long list of convictions simply because the last time the prospective tenant **was sentenced** (again, not released from prison) exceeds the allowable period for that crime. The prohibition of considering juvenile

17

dispositions has the same effect because even a repeated pattern of criminal conduct cannot be considered. Repeat offenders clearly present a higher risk of committing further crimes, so Plaintiffs generally do not rent to them. (*See, e.g.,* Rubin Decl., ¶ 40; Stefaniak Decl., ¶ 17).

Compelling Owners to lease to individuals they would otherwise reject results in a physical invasion. An uninvited person taking possession of their property. The invasion is substantial in that a lease demises a real property interest and grants the lessee the right to exclusive possession of the property (subject to limited inspection or other such rights). While a tenancy may not be permanent, the obligation to rent to applicants not of the Owners' choice is. And, leases generally span at least a year. As such, forcing Owners to allow individuals to occupy their property is a physical taking.

The Ordinance is not an exercise of the City's police or land use regulatory powers. It does not address the safe use of the demised premises, prohibit conduct or use of property in a manner that might constitute a nuisance, or provide for the orderly land use development. To the contrary, the Ordinance is plainly intended as a solution to perceived societal problems. It is, as set forth previously, difficult to discern what the specific objective of the Ordinance is, but it appears generally intended to facilitate the ability of persons with criminal backgrounds or poor credit to lease housing. The burden of providing this opportunity must be imposed upon all society not just Owners leasing property for residential housing.

That is particularly true in that burdens the Ordinance imposes upon Plaintiffs extend beyond the irreparable harm inherent in taking their property rights. The costs of a

tenant defaulting on a lease, damaging the property or engaging in criminal or other disruptive conduct falls on the Owner. Evictions take time during which the property generates no income while carrying costs continue. Evictions are also an expensive process. Owners furthermore bear the ultimate burden of repairing property damage, which often are not covered by security deposits.

Additionally, property owners have a duty to address and prevent disruptive conduct in their properties. (Rubin Decl., ¶ 33; Stefaniak Decl, ¶ 10; Fletcher Decl., ¶ 8; Smith Decl., ¶ 8). City ordinances impose the duty upon Owners, with the assistance of City personnel, to prevent the commission of certain crimes and conduct on the premises, such as prostitution, drug activity, possession of weapons, and disorderly conduct. Ordinance § 244.2020(a). An increase in criminal activity on the premises will lead to heightened licensing oversight, City intervention, or even revocation of rental licenses. Ordinance § 244.2020(d). Owners also face civil claims by persons their tenants injure.

To make matters worse, a recently enacted Security Deposit Ordinance precludes Owners from attempting to obtain security for the additional risks imposed upon them by prohibiting them from requiring a security deposit of more than one month's rent. *See* Minneapolis, Minnesota, Code of Ordinances § 244.2040 ("Security Deposit Ordinance"). Prior to the enactment of the Ordinance and the Security Deposit Ordinance, if an applicant had, for example, one to three late payments within the past 12 months, a low credit score, or negative references, each of which would be disabling, Plaintiffs would often obtain an additional security deposit to ameliorate any potential financial risk in renting to that applicant. (Rubin Decl., ¶¶ 51, 56). The City imposed additional risk on Owners while

19

prohibiting them from taking reasonable measures to ameliorate some of this risk. (*Id.*, ¶¶ 53, 58).

By taking away Owners' fundamental, constitutionally-protected property interest and ability to exclude unwanted persons or physical presences from their property, the City has physically invaded Owners' property by determining who may occupy their property and has done so without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Minnesota Constitution.

2.    **Even if the Ordinance Does Not Result in a Constitutional Taking, It Still Deprives Plaintiffs of Due Process**

a.    **The Ordinance Is Subject to Strict Scrutiny Review Because it Invades A Fundamental Property Right**

The Fourteenth Amendment prohibits any deprivation of life, liberty, or property "without due process of law."  U.S. Const. amend. XIV, § 1. The Minnesota Constitution affords the same protection. Minn. Const., Article I, Section 7; *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012). Due process requires that legislative enactments depriving citizens of life, liberty or property rights must advance a legitimate state interest of sufficient magnitude to warrant the deprivation. *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

In *McGuire v. Indep. Sch. Dist. No.* 833, the Eighth Circuit recognized that:

To have a constitutionally cognizable property interest in a right or a benefit, a person must have a legitimate claim of entitlement to it. Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. But federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.

20

863 F.3d 1030, 1034 (8th Cir. 2017). Any deprivation of a constitutionally protected property right triggers due process protection, but how compelling the state's interest must be and the degree of judicial scrutiny of the state's action depends upon the nature of the impacted rights.

Legislation infringing a fundamental right are subject to strict scrutiny. *Gallagher*, 699 F.3d at 1017 (8th Cir. 2012) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). *See also*, *Brekke v. City of Blackduck*, 984 F. Supp. 1209, 1235 (D. Minn. 1997) ("[T]he Government is forbidden from infringing upon certain 'fundamental' liberty property interests to any degree - - no matter what process is provided - - unless the infringement is narrowly tailored to serve a compelling governmental interest."). *Accord*, *SooHoo v. Johnson*, 731 N.W.2d 815, 821 (Minn. 2007) (Minnesota Constitution). Only those rights and liberties "which are objectively, deeply rooted in the Nation's history and tradition" are fundamental. *Gallagher*, 699 F.3d at 1017.

The rights attendant to the ownership of real estate are deep rooted in Anglo-Saxon law. *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 235-36 (1897) ("Due protection of the rights of property has been regarded as a vital principle of republican institutions."). Real estate ownership is the most fundamental property right. *Kaiser*, 444 U.S. at 176. Citizens' right to be secure in their land holdings has been recognized as far back as the Magna Carta. EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 45 (1797)("[n]o freeman shall be taken, or imprisoned, or be **disseised of his freehold**, . . . but by lawful judgment of his peers, or by the law of the land.") (emphasis added). The Fifth Amendment's Due Process Clause was specifically intended

to extend these same protections in this country. *Kerry v. Din*, 576 U.S. 86, 90-92 (2015) As it simply adopts the Fifth Amendment's Due Process Clause, the Fourteenth Amendment was clearly intended to extend its limitations to the states.

As set forth previously, the Supreme Court has found that "one of the most essential sticks in the bundle of rights that are commonly characterized as property" is the ability to grant or deny access as they see fit. *Kaiser*, 444 U.S. at 176 (1979). *See also,* James Madison*, Property,* National Gazette, Mar. 27, 1792 ("This term [property] in its particular application means 'that dominion which one man claims and exercises over the external things of the world, in exclusion of every other individual.'").

The right to control access to real property is accordingly fundamental. *See e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540-41 (2005). *Contrast, Gallagher,* 699 F. 3d at 1017 (refusing to characterize the right to smoke outdoors on public property as fundamental); *Patel v. City of Sauk. Ctr.*, 631 F. Supp. 2d 1139, 1148 (D. Minn. 2007) (refusing to recognize a fundamental right in the transfer of a liquor license). In this country's over two hundred and forty year history, property owners' authority to determine on a nondiscriminatory basis to whom and on what terms to lease their property has not been questioned. An expectation so engrained in the Nation's political and economic systems is fundamental.

In *Fletcher Properties, Inc. v. City of Minneapolis*, 947 N.W.2d 1, (Minn. 2020), the Court upheld the constitutionality of a City ordinance prohibiting landlords from refusing to rent to individuals on the basis of an unwillingness to comply with the requirements of Section 8 of the United States Housing Authority Act of 1937 to against

challenges that its violated the guarantees of due process of law under Minnesota's Constitution. In reaching this conclusion, the Court applied a rational basis standard of review. However, it did not consider whether the ordinance at issue violated implicated fundamental rights because the parties agreed that it did not. *Id*., at 10 n.5. The ordinance in *Fletcher Properties* imposed one limitation upon landlords' ability to exclude tenants while the Ordinance seeks to control the entire screening process. That decision has no bearing upon whether the Ordinance impedes Plaintiffs' fundamental rights.[4]

### b.   The Ordinance Cannot Survive Strict Scrutiny Review

Where legislation impacts fundamental rights, it must be "narrowly tailored to serve a compelling state interest." *Id.*; *see also Karsjens v. Piper*, 845 F.3d 394, 407 (8th Cir. 2017) ("[T]he strict scrutiny standard . . . is reserved for claims of infringements on fundamental liberty interests upon which the government may not infringe unless the infringement is narrowly tailored to serve a compelling state interest." (internal quotations and citations omitted); *Brekke*, 984 F. Supp. at 1235 ("[T]he Government is forbidden from infringing upon certain 'fundamental' liberty interests to any degree - - no matter what process is provided - - unless the infringement is narrowly tailored to serve a compelling governmental interest.").

The Eighth Circuit has found the definition of a compelling state interest "deceptively self-evident", defining it as an interest "extremely important" or of the "first order." *Republican Party v. White*, 416 F.3d 738, 749 (8th Cir. 2005) (citing David Grump,

---

[4] Further, *Fletcher Properties* has no bearing on plaintiffs' federal constitutional claims.

*The Narrow Tailoring Issue in the Affirmative Action Cases: Reconsidering the Supreme Court's Approval in Gratz and Grutter of Race-Based Decision Making by Individualized Discretion*, 56 Fl. L. Rev. 483 (2004). "A narrowly tailored regulation is one that actually advances the state's interests (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not under inclusive), and could be replaced by no other regulation that could advance the infringement[.]" *Republican Party*, 416 F.3d at 749. The Ordinance lacks each of these characteristics.

> **(1)    The Ordinance's Failure to Define the Interests It Was Enacted to Address Preclude Any Finding of A Compelling State Interest**

As noted previously, the Ordinance does not identify the government interests it seeks to advance. Based on the limitations imposed, it appears directed to facilitating the ability of individuals with prior criminal convictions, poor credit histories or adverse rental histories to obtain housing. But, there is also no statement that this is the Ordinance's purpose. There is also no indication of why the City believed it was necessary to provide this assistance.

The Ordinance's Findings and Purpose section addresses the purported issues in the general market for rental housing in Minneapolis, sociological issues that may cause minorities and low income residents to be more likely to have a criminal history, prior evictions or credit issues, U.S. Department of Housing and Urban Development guidelines on the appropriate consideration of criminal records in rental decisions and purported problems with credit reporting. But, none of these issues are tied to the circumstances of

individuals with criminal backgrounds, a history of evictions or poor credit histories. There is no assertion that individuals with these backgrounds cannot obtain housing and certainly no assertion that they cannot secure housing that similarly situated individuals without those issues are able to obtain. The Ordinance does not even address how criminal backgrounds, eviction history and poor credit ratings are considered in leasing decisions in the Minneapolis housing market.

Where the issue sought to be addressed by an enactment is not and apparently cannot be stated clearly, there is no basis to conclude that it is directed to addressing an interest of "extreme importance" or of the "first order". An issue of this nature should easily be identifiable. Here, it was not. As the Ordinance does not define its purpose or a legitimate issue to be addressed, it cannot be deemed to promote a compelling state interest.

Even if there were a basis to conclude a history of criminal convictions, evictions or poor credit impacted individuals' ability to obtain housing, the Ordinance offers no basis to conclude that these issues are irrelevant to applicants' likelihood of defaulting, damaging the premises or threatening the safety or quiet enjoyment of other tenants. It is claimed that credit scores do not "necessarily" predict the likelihood of a default, but that qualified assertion is not a finding that they have no bearing. Further, the Ordinance permits consideration of prior evictions and criminal convictions in some circumstances, which is a concession of their potential relevance. *See also*, U.S. Department of Justice, Office of Justice, Bureau of Justice Statist, Ex. B to Jacobson Decl. (67.8% of released prisoners were arrested for a new crime within three (3) years and 76.6% were arrested within five

(5) years); U.S. Department of Justice Report, Ex. C to Jacobson Decl.)  (half of released sex offenders had a subsequent arrest that led to a conviction.)

Nevertheless, apparently attempting to distinguish between repeat criminal offenses and housing success, one of the findings for the Ordinance is that "[s]ociological research does not support the idea that a criminal record provides accurate information about the potential for housing success."  Ordinance, §244.2030(a)(17). There is no legitimate basis for this distinction. It is primarily based upon a January 2019 study authored by Cael Warren. *Success in Housing: How Much Does Criminal Background Matter*? (2019) (the "Wilder Study"). But, the Wilder Study focused on properties providing a high level of supportive services. *Wilder Study*, at n. 4 ("[A]pproximately half of the population resides in properties with level 3 services, which generally include staff on-site for several days per week, in-depth case management services, and programming in areas such as employment services, health and wellness, youth development, etc. About one-quarter of householders live in properties with level 2 services, which include fewer days of staff on-site and more limited programing. Level 1 services are lighter-touch and focused on eviction prevention. About 15 percent of households in the study live in properties with level 1 services available"); *Id*. at 9 (noting that the average service level for the sample size was 2.1 on a four point scale ranging from level 0 - no services – to level 3 - full supportive housing services). Those services are not offered in the general market housing Plaintiffs offer. Moreover, the Wilder Study focused on individuals convicted of lower grade crimes and the likelihood of a convict committing the same or similar crime in the future. It accordingly provides no support for the limitations imposed on the right to screen

26

for violent or other serious crimes. *Wilder Study*, at 12-13 (noting that only 2.7%, 2.6%, and 1.6% of the sample held convictions for assault, domestic violence and "other violent offenses," respectively). Beyond that, there is certainly a nexus between repeated offenses and housing success, at least to the extent that a tenant incarcerated during the course of a tenancy will certainly default. Considering only the likelihood of default also ignores the numerous other issues a tenant may present.

Moreover, credit scores have been demonstrated predictive of individuals' likelihood of meeting their ongoing financial obligations. (Rubin Decl., ¶¶ 49-50; Stefaniak Decl., ¶ 27). That is precisely what rent obligations are. There is a broad range of credit scores. At some point, it cannot reasonably be argued that a score will be so low that it is reflective of a high risk of potential default.

There cannot be a compelling government interest in foreclosing landlords from considering factors predictive of applicants' likelihood of meeting their lease obligations, damaging the premises or threatening other tenants. A determination that consideration of these factors should nevertheless be constrained to promote social welfare objectives would not be sustainable because the burden of ameliorating whatever conditions were sought to be addressed cannot be imposed on one segment of society. Prohibiting consideration of these factors would constrain Plaintiffs' right to determine access to their property and expose them to additional expense and risk. And, all to no purpose because placing individuals in housing they cannot maintain accomplishes nothing. It will just result in their eviction. Further, the inability to rent to whom one chooses will inevitably lead Owners

and developers to either cease doing business in Minneapolis or not enter the market in the first place, providing less housing overall and stunting Minneapolis's recent housing boom.

> ### (2) The Ordinance Is Not Narrowly Tailored to Advance Any of the Diffuse Interests Identified Therein

As there is no compelling state interest supporting the Ordinance, it *a fortiori* is not narrowly tailored to advance any such interest. Even if there was some legitimate objective in assuring that only relevant screening factors are considered or in facilitating the ability of those with criminal records, past evictions or poor credit history to obtain housing, there other circumstances in which those considerations simply do not apply. Ordinance does not differentiate those circumstances.

As noted previously, the Ordinance prohibits consideration of past convictions beyond the time period specified therein even to establish a history of multiple offenses. Repeat offenders present a manifestly different risk. Any objective of addressing the disparate number of convictions among minorities or facilitating rehabilitation does not justify prohibiting landlords from adopting screening criteria excluding repeat offenders.

If "dates of sentencing" refers when the applicant is sentenced, landlords would be precluded from considering a conviction from the moment an offender is released from prison. That is inconsistent with the recognition even in the Ordinance that the likelihood of committing another crime decreases over time. There is also no principled basis for the designated periods during which criminal convictions may be considered. Those designations appear to be based upon seriousness of the crime, but the broad categories established in the Ordinance do not adequately differentiate among crimes. For instance,

the first degree manslaughter and first degree murder are grouped together even though murder is an intention act while manslaughter includes crimes of passion. Minn. Stat. § 609.20. The relevance of a criminal conviction to the leasing decision is not always dependent upon its seriousness. As prostitutes may service customers at a demised premise, a prostitution conviction is more significant than, for example, a simple assault conviction arising out of an altercation. There are also some crimes, such as, kidnapping and murder, the conviction of which for which no social policy considerations would justify requiring landlords to lease to someone who committed those offenses.

Additionally, there is no basis to conclude that credit scores are never relevant to applicants' likelihood of meeting their rental obligations. At some point, a credit score is so low to be reflective of either an inability to meet the applicants' legitimate obligations or inability to assume additional monetary obligations. Yet the Ordinance prohibits any consideration of credit scores.

Moreover, the Ordinance is under inclusive because of its failure to address the root cause of the issues it appears to address. For instance, if there is a high error rate in credit histories, the City could pass measures to increase their accuracy or afford residents cost effective means of correcting those errors. The City could create housing providing supportive services for recently released inmates or credit counseling services.

> ### c. The Ordinance Is Not Rationally Related to a Legitimate Government Interest.

Even if fundamental rights were not at stake, the Ordinance would still violate Owners' substantive due process rights. An ordinance only passes constitutional muster if

it is "a reasonable means to a permissive object." *State v. Behl*, 564 N.W.2d 560, 567 (Minn. 1997)). Because the City wholly failed to identify a purpose or "object" of the Ordinance, it follows that it is impossible to determine whether the Ordinance is a reasonable means to that object. As discussed in detail above, it is clear the City failed to think through how the Ordinance would work in practice and whether it would actually advance those interests. As discussed above, the only practical impact of this Ordinance on housing will be a *reduction* in affordable housing. Accordingly, Plaintiffs are likely to succeed on their substantive due process rights.

### 3.    The Ordinance Is Unconstitutionally Vague and Ambiguous.

Vague statutes imposing civil or criminal penalties violate due process. *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012); *State v. Newstrom*, 371 N.W.2d 525, 528 (Minn. 1985); *D.C. and M.S. v. City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986). If a statute imposes criminal penalties, a higher standard of certainty is required. *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)). The "penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Newstrom*, 371 N.W.2d at 528 (quoting *Kolender*, 461 U.S. at 357). The Ordinance abjectly fails this standard.

The Ordinance invites arbitrary and discriminatory enforcement because it "lacks adequate standards restricting the discretion of the governmental authority that applies it." *State v. Ness*, 819 N.W.2d 219, 228 (Minn. App. 2012) (citing *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966); *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974). While

30

providing that a violation, "may result in criminal prosecution, adverse rental license action, and/or administrative fines, restrictions, or penalties as provided in chapter 2 of this Code, the Ordinance does not define or in any manner limit what "criminal penalties," adverse rental license action, or fines may be imposed. Ordinance, § 244.2030(g); see *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So too, vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute."). That is apparently left entirely to the whim of the authorities applying it. And, there is not even a hint as to whom that is. The reference to Title 1, Chapter 2 of the Minneapolis Code of Ordinances offers no clarity because it provides for administrative enforcement of licensing violations. Further, the Ordinance provides that no notice of violation is required so Owners are afforded no warning of a possible violation or opportunity to cure.

These unnamed enforcers will be "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio*, 382 U.S. at 402-03. Most troubling is the individualized assessment requirement. As explained previously, what "consider[ation]" an owner must give applicants' supplemental evidence is uncertain. Does it mean the landlord must give it more consideration than reading it?  If so, what is required? For example, if an applicant attempts to negate an eviction by contending it was without basis, it is unclear whether an Owner must accept the truth of those assertions. Beyond that, to what extent the Owner's determination is subject to challenge is uncertain. The Ordinance appears to permit Owners to be held criminally liable if a fact finder were to disagree with their assessment that proffered supplemental evidence

31

does not negate an unsatisfied screening criteria.

The Ordinance is otherwise so ambiguous that proper compliance is impossible. Section 244.2030(b) states that an Owner must make readily available to applicants the Owner's screening criteria "in as much detail as feasible."  That is an inherently subject standard. It also fails to provide sufficient information to evaluate an applicant's criminal history. Sections 244.2030(c)(1)(f), (g), and (h) of the Ordinance require Owners to evaluate an applicant's criminal history record from the "dates of sentencing" for crimes committed. However, the phrase "dates of sentencing" could mean the date the sentence was imposed or the date the sentence began to run. As the plural "dates" is utilized, it might also mean the dates during which applicants served their sentence (although if that were the intention, the Ordinance presumably would refer to dates of incarceration). How this terms is interpreted makes an enormous difference because, as set forth previously, Owners may be unable to consider a conviction from the moment applicants are released from prison if dates of sentencing means when sentence was imposed or began to run.[5]

It is unclear what criminal convictions for felony offenses are excluded from the Ordinance based on mandated denial of tenancy in federally assisted housing programs. Section 244.2030(c)(1)(g) of the Ordinance states that an Owner may not consider a

---

[5] Inexplicably, the Ordinance's "inclusive screening criteria" allows Owners to consider only recent convictions for misdemeanors and felonies, but does not address at all the separate, intermediary category of gross misdemeanor offenses, which include "any crime which is not a felony or a misdemeanor." Minn. Stat. § 609.02, subd. 4. Thus, the Ordinance forbids rejecting an applicant convicted of first-degree murder with dates of sentencing ending 11 years earlier, regardless of the applicant's record of prior felony convictions, but allows an Owner to reject an applicant because of one gross misdemeanor conviction for a theft of property between $500-1000 or a second DWI in 10 years from 35 years prior.

conviction for a felony offense for which the dates of sentencing are older than seven (7) years unless that offense, *inter alia*, is one of "those same offenses that mandate denial of tenancy in federally assisted housing subject to federal regulations . . . ." The Ordinance does not specify to which federally assisted housing program and/or federal regulations it refers. There is no guidance to determine what criminal convictions fall within this exception.

In addition, as also noted above, Section 244.2030(c)(2)(a) of the Ordinance states that an Owner may not reject an applicant based on a low credit score "by itself" but may consider information within a credit report that is "directly relevant to fitness as a tenant." That language does not tell an Owner whether it may base a rejection on a low credit score in conjunction with other information in the credit report that meets the "directly relevant" criteria, or whether it is prohibited from basing a rejection on a low credit score in all instances. Furthermore, that same Section o provides no guidance as to what information in a credit report is "directly relevant to fitness as a tenant." Accordingly, an Owner cannot know whether its subjective belief that some information is "directly relevant" is sufficient for compliance, or whether reasonable belief is required, or whether some other standard will be applied to determine either that the information is "directly relevant" or, conversely, that it is not "directly relevant" and the Owner has subjected itself to the significant consequences of having violated the Ordinance.

Section 244.2030(c)(3)(c) of the Ordinance requires an Owner to allow exceptions from the 3x Income Test where the applicant can demonstrate "a history of successful rental payment" with a lower income. There is no definition or guidance for an Owner to

determine what constitutes a "successful" payment history. If there were any defaults, is that an unsuccessful history?  There is also no definition or guidance as to the length of time an applicant must have had "successful rental payment" in order for it to constitute a "history" under the Ordinance.

Acknowledging these problems, the Ordinance promises that "[p]rior to the effective date, the city will convene a cross-sector implementation committee to create and execute an implementation plan . . .The committee will determine best practices and policies for ordinance implementation, including the creation of relevant screening templates for legal screening options including individualized assessment, and create an outreach and engagement plan."   Ordinance, § 244.2030(i). Despite convening an implementation committee, that committee failed to create or execute any implementation plan, determine best practices and policies for ordinance implementation, create screening templates for legal screening options, or create an outreach and engagement plan prior to the effective date of the Ordinance, and has also failed to do so at any time prior to the filing of Plaintiffs' Complaint.

Due to this lack of clarity, Owners are at serious risk of significant criminal, civil, and administrative penalties for violating the Ordinance. Because it is unclear as to what speech and conduct is forbidden or punishable, this Ordinance is void for vaguenessand Plaintiffs are likely to succeed on the merits of their vagueness challenge. *See Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972).

Because Plaintiffs have shown they are likely to succeed on the merits of a number of their claims, this *Dataphase* factors weighs in favor of granting a preliminary injunction.

34

**C.     Plaintiffs Have Suffered and Will Continue to Suffer Considerable, Irreparable Harm without Injunctive Relief.**

Plaintiffs have suffered and will continue to suffer irreparable harm from the Ordinance unless and until the Court grants injunctive relief. As set forth above, Defendant has imposed significant restrictions on Plaintiffs' fundamental property rights amounting to an unconstitutional taking of Plaintiffs' property and deprived Plaintiffs of these rights through an impossibly vague and ambiguous Ordinance that subjects Plaintiffs to significant penalties, including criminal prosecution, loss of rental license, fines, and other damages. The denial of a constitutional right is *per se* irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 ("[Loss of constitutional] "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Because Plaintiffs have demonstrated a likelihood of success on the merits of their claims, they have established they will suffer irreparable harm without injunctive relief, and this *Dataphase* factor weighs in favor of injunctive relief. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (citing *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996); *see also Northshor Experience, Inc. v. City of Duluth*, 442 F. Supp. 2d 713, 719 (D. Minn. 2006).

**D.     Balance of Harms Favors Injunctive Relief**

The next *Dataphase* factor requires the court to balance the irreparable harm to the Owners, and the injury that granting the injunction will inflict on the City. Because Plaintiffs are challenging the validity of the Ordinance, case law confirms that the balance of harm need not be considered, because the government suffers no harm by enjoining

enforcement of an invalid law. *Bank One,* 190 F.3d at 847-48. Even if considered, however, this factor tips sharply in favor of an injunction. The loss of Plaintiffs and other Owners' constitutional freedoms pales in comparison to whatever alleged harm Defendant might suffer from the issuance of an injunction. Accordingly, this *Dataphase* factor also weighs in favor of granting injunctive relief.

E.     **Public Policy Supports Injunctive Relief.**

As with the balance of harm factor, this Court is not required to consider the public policy factor in the context of this case, because "the public interest will perforce be served" by enjoining enforcement of an invalid law. *Bank One*, 190 F.3d at 847-48. Furthermore, Plaintiff's claims are based on rights protected by the United States and Minnesota Constitution. Granting injunctive relief to enforce such rights will, accordingly, support the freedoms guaranteed by the United States and Minnesota Constitutions.

When deciding a constitutional challenge, this factor is dependent on the determination of the likelihood of success on the merits, because it is always in the public's best interest to protect constitutional rights. *Phelps–Roper,* 545 F.3d at 690; *see also Kirkeby v. Furness*, 52 F. 3d 772, 775 (8th Cir. 1995). Because Plaintiffs have established they are likely to succeed on the merits of its claims, this final *Dataphase* factor also weighs in favor of granting injunctive relief.

## IV.     <u>CONCLUSION</u>

As set forth above, all of the *Dataphase* factors weigh in favor of granting injunctive relief. Accordingly, Plaintiffs respectfully request that the Court grant its Motion for

36

CASE 0:20-cv-01904-PAM-BRT   Document 51   Filed 09/08/20   Page 37 of 37

Preliminary Injunction to enjoin Defendant from enforcing the Ordinance until this litigation is resolved.

COZEN O'CONNOR

*/s/ Mark Jacobson*
Mark Jacobson (#0188943)
E-mail: mjacobson@cozen.com
Steven Katkov (#0202769)
E-mail: skatkov@cozen.com
Cassandra M. Jacobsen (#0400120)
E-mail: cjacobsen@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000

Robert Hayes (PA #33099)
(admitted *pro hac vice*)
E-mail: rhayes@cozen.com
Calli Padilla (PA #312102)
(admitted *pro hac vice*)
E-mail: cpadilla@cozen.com
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2000

*Attorneys for Plaintiffs*

Dated:   September 8, 2020